William CROCKETT et al.

v.

VIRGINIA FOLDING BOX CO. et al.

Civ. A. No. 562-72-R.

United States District Court,
E. D. Virginia,
Richmond Division.

Jan. 4, 1974.

Geoffrey Judd Vitt, Alexandria, Va.,
Robert B. Fitzpatrick, Robert B. Wal-

lace, Washington, D. C., Seymour Du-Bow, Richmond, Va., for plaintiffs.

Francis V. Lowden, Jr., Richmond, Va., Donald M. Murtha, Washington, D. C., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs, employees of the Virginia Folding Box Company (hereinafter referred to as the Company), allege race discrimination on the part of the Company in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and Section I of the Civil Rights Act of 1866, 42 U.S.C. § 1981. They seek relief as a class. Jurisdiction is attained pursuant to § 706(f) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f) and by 28 U.S.C. § 1343(4).

The instant issues before the Court are raised by two motions of the defendant Company. The first is one to define the class. The second for a protective order limiting plaintiffs' discovery to exclude requests for information and documents related to the activities of the defendants' expert, Dr. Tiffin, in evaluating the Company's employment testing program. The second motion also seeks an order quashing a notice to take the deposition of Dr. Tiffin.

I. Definition of the Class:

The undisputed facts, as they relate to this motion, are as follows:

Some time prior to 1964, the Company divided its plant employee functions into two divisions. One was the Gravure Division, which employed persons in the positions of apprentice pressmen and pressmen, and the Plant Services Division, which employed persons in various positions involving a lower grade of manual labor and for which the compensa-

tion was less than for pressmen and apprentice pressmen.[1]

Prior to June 16, 1964, all of the positions of pressman and apprentice pressman, which at that time included the entire Gravure Division, were held by white employees; blacks being excluded therefrom. Some time in 1963, black employees brought pressure on the Company to open up these positions to blacks. As a consequence, the Company instituted an ostensible policy, in early 1964, of considering applications by blacks for the two high grade positions in the Gravure Division on an equal footing with white applicants. At that time it invited all Plant Services Division employees, which then included all of the Company's black plant employees, to apply for openings in the positions of apprentice pressman and pressman.

However, along with this policy of ostensibly opening up these high grade positions to blacks as well as whites, the Company instituted another policy of requiring satisfactory performance on a Specific Aptitude Test Battery (SATB), administered by the Virginia Employment Commission (VEC), as a condition precedent to the transfer of old employees, or the placement of new employees, into these positions.[2] The requirement applied to all applicants, white and black. However, those employees who were already holding these positions, all of whom were white, were not required to pass the test as a condition to continuing their respective positions.

The Company additionally instituted a policy of requiring satisfactory performance on a General Aptitude Test Battery (GATB), developed by the United States Department of Labor, and also administered by the VEC, as a condition precedent to employment in any position

---

1. The Plant Services Division included the following job functions: catcher, palletizer, floorman, shafter, forklift operator, bailer, truck driver, janitor, laborer, chauffer, bander and sweeper.

2. While the matter is not clear, it would appear that the test is actually a prerequisite to the postition of apprentice pressman and experience in that position is, in turn, a prerequisite to the position of pressman.

within the Company.[3] Here again, it does not appear that previous employees were required to pass the test in order to maintain their positions.[4]

In 1965 the Company re-organized its employee job functions by eliminating the old Plant Services Division and creating a new Independent Division, and the Gravure Division was retained. The positions of catcher, palletizer, and floorman were transferred from the old Plant Services Division to the Gravure Division. The positions of shafter, forklift operator, bailer, truck driver, janitor, laborer and chauffer were transferred from the old Plant Services Division to the new Independent Division. The positions of bander and sweeper were eliminated.

From that time forward, all employees entering the Gravure Division have begun in the position of catcher. Promotions to the position of apprentice pressman are given to the most senior catcher, palletizer or floorman within the Gravure Division who has passed the qualifications test.

Five of the six remaining named plaintiffs,[5] Messrs. Crockett, Brown, Chavis, Miller and Williams, are presently employed in the Gravure Division as catchers, palletizers and/or floormen. All five were employed with the Company, prior to 1964, in the old Plant Services Division. All have been excluded from the positions of apprentice pressman and pressman from the time they came with the Company until the present. At least

four of the five, Messrs. Crockett, Brown, Miller and Williams, took the SATB in efforts to attain the position of apprentice pressman, but failed to achieve a satisfactory performance. There is some dispute between the parties as to whether plaintiff, Chavis, took the test and failed to qualify, or simply did not take the test.

The sixth remaining named plaintiff, Cooper, was hired by the Company as a catcher in 1971, took the SATB, and also failed to qualify for the position of apprentice pressman. Mr. Cooper terminated his employment with the Company during the pendency of this suit.

In addition to the aforesaid facts over which there is no apparent dispute, the plaintiffs have alleged that there are additional (unspecified) positions which have been subject to racially discriminatory placement practices prior to 1964.

The plaintiffs have also alleged that the aforementioned tests disqualify disproportionately more blacks, as compared to whites, and they have not been shown to, and do not, predict job performance in the relevant positions.

Finally, the plaintiffs have alleged that the provisions of the collective bargaining agreement between the defendant Company and the defendant Union provide that one may not carry over accumulated seniority when one transfers to another division.[6]

It appears to the Court, on the basis of the allegations and undisputed facts,

---

3. While the matter is again unclear, it would appear, on the basis of the plaintiffs' allegations, that different positions are geared to different levels of performance on the test, so that an applicant could conceivably achieve a score sufficient to qualify for certain jobs while not qualifying for others.

4. It is unclear, however, whether a previous employee might be able to advance to another job, other than pressman or apprentice pressman, without taking the GATB and attaining a certain level of performance on that test.

5. Mr. Broadnax, who was originally the seventh named plaintiff, has withdrawn from the litigation.

6. This allegation may not be in dispute. It is one which has only recently been included in plaintiffs' amended complaint and one to which the defendants have, thus far, not responded at all. In any event, the rulings on pending motions are not dependent on the factuality of that allegation.

that the plaintiffs' legal contentions are as follows:[7]

1. The reliance, as a condition of promotion to the formerly all-white positions of apprentice pressman, pressman and other unspecified positions, upon the tests heretofore referred to, constituted intentional racial discrimination in that:

a. it serves to perpetuate a pattern of racial discrimination that was in effect prior to 1964;[8] and

b. the tests disqualify disproportionately more blacks, as compared to whites, and they have not been shown to, and do not, predict performance in the positions. See Griggs v. Duke Power Co., *supra,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

2. The seniority system provision disallowing the transfer of accumulated seniority from one division to another constitutes intentional racial discrimination in that it serves to perpetuate prior patterns of racial discrimination. See Local 189, United Papermakers & Paperworkers, AFL–CIO, CLC v. United States, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). (Seniority plan maintaining the effects of prior discrimination).

This claim, in turn, also assumes that prior discrimination will have been shown.[9]

Recognizing the great overlap that would, of necessity, exist, the Court, nevertheless, deems it appropriate to begin the analysis by separately defining each class of potential plaintiffs who stand in a position to raise one of the two claims. This is because of certain potentially conflicting interests which appear to the Court may exist with respect to the second claim but not with respect to the first claim.

The two potential classes of plaintiffs would include:

1. All black applicants for employment and employees with the Company who have been, are being, or will be excluded from employment, or from certain positions, including the positions of apprentice pressman and pressman, because of their failure to take or to pass[10] one

---

7. The Court points out that it is necessary here to make a preliminary inquiry into the general nature of the plaintiffs' potential claims similar to the inquiry frequently required to determine jurisdictional issues. See, *e. g.,* Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946) (subject matter jurisdiction asserted on the basis of a claim allegedly "arising under the Constitution . . . .". Such inquiry is required in order to determine whether the prerequisites of a class action (in reference to the defined class) found in Rule 23(a)(2)(3) and (4), F.R.Civ. P., have been met. See discussion below.
The Court emphasizes, however, that this inquiry and discussion in no way limits the breadth of potential claims which plaintiffs may raise in this case. Additionally, it does not establish that such claims as are discussed are necessarily encompassed in the litigation. Appropriate adjustments in the defined class can be made as the record develops and plaintiffs' legal claims are further refined. See Rule 23(c)(1) and (3), F.R.Civ.P. This may result in either a broadening or narrowing of the defined class or sub-classes.

8. See Griggs v. Duke Power Co., 420 F.2d 1225, 1230–1231 (4th Cir. 1970), rev'd. on other grounds, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), (qualifications tests locking in prior patterns of discrimination). This aspect of the claim, in turn, assumes that a pattern of discrimination will be shown *to have existed prior to 1964.*

9. However, any such discrimination need not have occurred prior to 1964. Any discrimination up until the present, including that suggested in the preceding claim, would possibly suffice.

10. The Court considers irrelevant, for present purposes, whether a particular member of the class has been, is being, or will be excluded from a desired position because that person failed to pass the required test or because he did not take it at all. The basic challenge would appear to attack the very existence of these particular tests as qualifications for hire and advancement.

or more of the required aptitude tests.[11] (Hereinafter referred to as Sub-Class #1).

2. All black employees of the Company who have been excluded from certain positions, including the positions of apprentice pressman and pressman, either because of the Company's alleged pre-1964 discriminatory policies or because of a failure to take or to pass the required aptitude tests; and who have been, and are being, or will be adversely affected by the seniority provision disallowing the interdivisional transfer of seniority, in their attempts to attain the aforementioned positions. (Hereinafter referred to as Sub-Class #2).

### A. Sub-Class #1

As to the first numbered sub-class, the Court is of the opinion that the prerequisites to a class action found in Rule 23(a) and (b), F.R.Civ.P., have been met.

First the Court accepts as factual the representations of counsel for the parties which show, in effect, that the sub-class is so numerous that joinder of all members would be impractical. See Rule 23 (a)(1).

Second, there can be no doubt that there are questions of law and fact common to the sub-class. See Rule 23(a)(2).

The class was defined in such a way as to include only those who would stand in a position to raise the first numbered potential claim under the theory found in subdivision (b) of that claim as set forth above.[12] It is true that this sub-class also includes a smaller group of potential plaintiffs who, alone, would stand in a position to raise the first numbered claim under the alternative theory found in subdivision (a) of the claim, as set forth above. However, this is of little consequence with respect to the requirements of Rule 23(a)(2), as the rule does not require a complete coincidence of legal claims. It requires only that there be *some* questions of law and fact in common.

Third, the claims of the representative parties are typical of the claims of the subclass. See Rule 23(a)(3). Plaintiffs, Messrs. Miller, Brown, Williams, Crockett and Chavis are all alleged to be factually situated in a position to raise the first numbered claim under both of the theories advanced. The only remaining named plaintiff, Mr. Cooper, allegedly stands in a position to raise the first numbered claim under the theory found in subdivision (b) of that claim as set forth above.[13]

The Court is satisfied, at this stage, that the representative parties will fairly

11. This class is defined to include all persons potentially in a position to raise the first claim, which challenges the use of aptitude tests as a condition of hire or promotion, under either of the theories set forth.

12. It is to be noted that any pre-1964 employees who stand in a position to raise the first numbered claim based on the theory found in subdivision (a) of the claim, as set forth above, by hypothesis stand in a position to also raise the same claim based on the theory found in subdivision (b) of the claim.

13. The defendant Company has made much of the fact that Mr. Cooper, who is the only named plaintiff hired after 1964, voluntarily terminated his employment with the Company since the institution of this suit. The Company contends that as a consequence, Mr. Cooper's presence in this suit is inadequate to represent the claims of other post-1964 employees. The Court takes note that this fact is not necessarily controlling. See Brown v. Gaston County Dyeing Machine Co., 457 F. 2d 1377 (4th Cir. 1972). But, see Bradley v. Southern Pacific Co., 486 F.2d 516 (5th Cir. 1973), 6 FEP cases 740. In any event, it is unnecessary for the Court to further consider Mr. Cooper's representative character at this time. It may be that post-1964 employees, unlike those hired prior to that date, would be limited to the theory found in subdivision (b) of the first numbered claim. However, even assuming, arguendo, Mr. Cooper's alleged non-representative character, but assuming further that no conflict of interests exists between pre-1964 and post-1964 employees (discussed below), the ability of the pre-1964 named plaintiff employees to proceed under both theories is sufficient to consider them as representing the interests of both groups.

and adequately protect the interests of the sub-class. See Rule 23(a)(4). Again assuming, arguendo, the non-representative character of Mr. Cooper, the claims of the other named plaintiffs, as shown above, are typical of those of the sub-class; the suit does not appear to be a collusive one; plaintiffs' counsel is experienced in civil rights litigation relating to employment discrimination; and, most important, the Court does not, at this time, foresee any conflicts of interest between the representative parties and other members of the class. See, Mersey v. First Republic Corp., 43 F.R. D. 465, 469 (S.D.N.Y.1968); Dolgow v. Anderson, 43 F.R.D. 472, 494 (E.D.N.Y. 1968); Herbst v. Able, 47 F.R.D. 11, 15 (S.D.N.Y.1969); Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562–563 (2d Cir. 1968). See generally, 3B Moore's Federal Practice, paragraph 23.07.

In reference to the issue of potential conflicts of interest, in particular, the Court recognizes that, assuming the plaintiffs prove their claim, a potential form of relief might, but would not necessarily, be limited to an order directing that members of the class be given an opportunity to qualify for the desired positions as they become open, without meeting the testing requirements. See Griggs v. Duke Power Co., *supra*, 420 F.2d 1225, 1230–1231 (4th Cir. 1970), rev'd. on other grounds, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The Court also recognizes the possibility that the named plaintiffs (excluding Mr. Cooper), all having been hired prior to 1964, could seek to limit the "competition" among members of the sub-class to be the first to achieve the fruits of success, under this type of relief, by pursuing the matter under the theory found in subdivision (a) of the claim, as set forth above, to the exclusion of the theory in subdivision (b). The Court, however, does not consider this potential conflict a serious threat at this time. It is fair to assume, in the absence of a contrary showing, that the pre-1964 employees would have plant seniority rights, vis-a-vis the post-1964 members of the class, to the openings which first occur. The Court, therefore, does not foresee, at this stage, any viable danger that the named plaintiffs would fail to pursue both theories of the claim with equal advocacy.

In addition, the Court takes note of the fact that there is presently pending, in this action, a motion by four post-1964 employees to intervene as named plaintiffs. While unnecessary to save the broader sub-class at this stage of the proceedings, this motion, if ultimately granted, should resolve all doubts on this score.

Finally, the Court considers that the requirements of Rule 23(b)(2) have been met. Again, the sub-class has been defined in such a way as to include only those who have been denied placement in certain positions because of their failure to pass or to take the challenged tests. The Court will assume, based partially on the defendant Company's own submitted papers, that the Company remains firm that no employee, white or black, will be promoted to a desired position, except in compliance with the testing program presently in effect.

### B. Sub-Class #2

As to this sub-class, the Court has serious doubts as to the representative character of the named plaintiffs with respect to the claim challenging the seniority provision which disallows the interdivisional transfer of seniority.

Plaintiffs' counsel has made representations to the Court which establish that, with the exception of plaintiff Cooper who is no longer employed by the Company, all of the named plaintiffs are presently employed in the Company's Gravure Division. On the other hand, there are indications in the pleadings that, as regards the continuing effects of alleged prior racial discrimination, the seniority provision in question works mainly to the disadvantage of blacks presently em-

ployed in the Independent Division; and, assuming the plaintiffs' success in the other facets of this litigation, its retention may even work to the advantage of blacks presently employed in the Gravure Division.[14] The Court considers that the danger of conflicting interests is sufficient to justify limiting the sub-class further, at least until such time as the plaintiffs can satisfy the Court that the aforementioned danger is minimal or nonexistent.

Accordingly, the sub-class which corresponds to the claim challenging the seniority provision in question will be limited to: All black employees of VFBC *who are presently holding positions in the Gravure Division*; and who have been excluded from certain positions, including the positions of apprentice pressman and pressman, either because of the Company's alleged pre-1964 discriminatory policies or because of a failure to take or to pass the required aptitude tests; and who have been, are being, or will be adversely affected by the seniority provision disallowing the interdivisional transfer of seniority in their attempts to attain the aforementioned positions.[15]

## II.  Requested Protective Order

■  Turning attention to the Company's motion requesting a protective order limiting plaintiffs' discovery to ex-clude certain information and documents related to Dr. Tiffin's activities in analyzing the Company's testing program, and quashing the notice to depose Dr. Tiffin, the Company alleges the following:

After the Supreme Court decision in Griggs v. Duke Power Co., *supra*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), which decision established general limitations on the use of aptitude tests in employment practices, the Company became concerned as to the possibility of litigation challenging its own use of such tests. This concern was based on the historical fact that the Company's use of such tests had prior thereto been the subject of review by the Equal Employment Opportunity Commission (EEOC) on several occasions.[16] In anticipation of litigation based on the rationale in Griggs v. Duke Power Co., *supra*, the Company retained Dr Tiffin, an industrial psychologist experienced in industrial employment testing techniques, to review its own testing program. The Company represents that it does not intend to introduce testimony by Dr. Tiffin at trial.

It is the Company's position that, because Dr. Tiffin is an expert retained "in anticipation of litigation" and because the Company does not intend to call him as a witness at trial, the requested documents and other informa-

---

14. While the record is by no means clear on this point, and it is still open to plaintiffs to show otherwise, it appears that perhaps all of the positions which have been subject to prior discrimination, at least in regard to the named plaintiffs, are positions within the Gravure Division. Even assuming this is not the case, the Court would be remiss if it failed to recognize that the advantages of interdivisional transfer might be primarily in one direction, and quite possibly in the direction of transfer to the Gravure Division. If this be the case, it may well be to the named plaintiffs' advantage to see that the seniority provision is maintained, so as to protect their own divisional seniority over that of subsequent transferees from the Independent Division, who may have greater plant seniority than their own.

The Court cannot conclude, however, on the record before it, that the named plaintiffs have no basis for raising a claim challenging the seniority provision in question on behalf of themselves and other black employees holding positions in the Gravure Division.

15. The sub-class may, of course, be later expanded to include similarly situated persons in other divisions upon a proper showing and motion by the plaintiffs. See Rule 23(c)(4), F.R.Civ.P.

16. It should be noted that all of these previous challenges before the EEOC had been resolved in the Company's favor by the administrative body.

tion are protected from discovery under the provisions of Rule 26(b)(4), F.R. Civ.P., except upon a showing of "exceptional circumstances under which it is impractical for [the plaintiffs] to obtain facts or opinions on the same subject by other means." The Company contends further that the plaintiffs have not here shown such exceptional circumstances.

The plaintiffs concede that Dr. Tiffin was retained "in anticipation of litigation," and that the requested documents and information falls within the scope of Rule 26(b)(4). They contend, however, that the exceptional circumstances referred to in the rule are here present and justify discovery.

More specifically, the plaintiffs who have retained their own expert, contend that the purpose for requesting the information and documents in question is not to make use of the same with respect to the issues surrounding the validity or invalidity of the Company's testing program. Rather, assuming they will be able to prove the charge of discrimination with respect to the tests, the plaintiffs anticipate a good faith defense contention by the Company in regard to the plaintiffs' claim for back pay. They contend, therefore, that the requested materials are needed to evaluate and ultimately challenge the factual basis for that defense. They point out further that direct evidence of this nature, going to Company officials' subjective state of mind as it does, is not otherwise available to them through their use of independent experts.

The Court is in accord with the plaintiffs that, viewed from the perspective of the intended use for which plaintiffs claim the information is sought, it is such as would not otherwise be available through the use of independent experts. However, the Court must also recognize generally the potential danger that parties standing in the instant plaintiffs' position who, in good faith as here, would attempt to obtain such information on a contention similar to that set forth and then quite innocently make use of the information in a manner violative of the spirit of the rule. The Court is of the opinion that in order to guard against this even innocent possible abuse, it is necessary for a party seeking disclosure under these circumstances to show also that they have a "substantial need" for the requested information. Only then can it be said that the "exceptional circumstances" referred to in Rule 26(b)(4) have been fully established.[17] The Court is not satisfied that the plaintiffs in this case have demonstrated a need so substantial as to overcome the inherent dangers.

In essence, the Court does not consider that any evidence generated through the requested discovery would be very material in rebutting defendant's possible good faith defense. At best, any such evidence would be material only as to the question of the Company's good faith subsequent to the time when Dr. Tiffin concluded his evaluation of the testing program. The plaintiffs have conceded, however, that Dr. Tiffin was hired in anticipation of litigation. It must, therefore, be assumed that at that time, litigation challenging the testing program was reasonably and proximately foreseeable.[18] Even assuming Dr. Tiffin's opinions and conclusions were such as would

17. Rule 26(b)(4) is not explicit in setting forth the requirement that a "substantial need" be shown. However, it is clear that Rule 24(b)(4) was drafted as a further limitation on materials and information otherwise discoverable under Rule 24(b)(3). See introductory paragraph to Rule 24(b)(4). Rule 24(b)(3) specifically provides for a demonstration of "substantial need." That requirement would therefore apply to Rule 24(b)(4) by reference and implication.

18. The plaintiffs have conceded that Dr. Tiffin was retained "in anticipation of litigation," the Court considers that the burden is on them to show that litigation was not really imminent at such time as Dr. Tiffin concluded his evaluation. This they have failed to do. The Court would be amenable, however, to reconsidering the matter upon such a showing by the plaintiffs.

draw into question the validity of the tests, the Court has serious doubt as to whether the Company's maintenance of the status quo, in the face of such findings, pending the outcome of litigation, would amount to bad faith.[19] The Court does not therefore consider that any evidence tending to establish that fact would be of substantial use in resolving the issue of good faith.

Accordingly, defendant's motion for a protective order will be granted.

The Court, of course, stands ready to prevent any injustice that might result through any attempt by the defendants to introduce evidence, directly or peripherally, of good faith based on the facts or results of Dr. Tiffin's evaluation.

An appropriate order shall issue.

19. By way of analogy, it would not be indefensible for a party who is faced with a threat of litigation, and who has been informed by his attorney that his legal position was vulnerable, to await the ultimate resolution of the issues by a court of law before taking action which the court itself might ultimately require him to take.