Roy P. WINDHAM, Harden Evans, Joe Skipper, David Nexsen, W. A. Turner and Toby Gaskins, Appellants,

v.

AMERICAN BRANDS, INC., Liggett & Myers, Inc., R. J. Reynolds, Inc. (R. J. Reynolds Tobacco Co.), Brown & Williamson Tobacco Corporation, The Imperial Tobacco Company (of Great Britain and Ireland) Ltd., Mullins Leaf Tobacco Company, Inc., C. W. Walters Company, Inc., Export Leaf Tobacco Company, Loews Theaters, Inc. (d/b/a Lorillard), Philip Morris, Inc., Universal Leaf Tobacco Company, Inc., The Austin Company, Inc. (Greenville, Tenn.), J. P. Taylor Company, Inc., Dibrell Brothers, Inc., and Earl L. Butz, Secretary of Agriculture of the United States, Appellees.

No. 75–2315.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 14, 1977.

Decided Oct. 11, 1977.

E. N. Ziegler, Florence, S. C. (H. Page Dees, Conway, S. C., John A. Cochrane, John E. Thomas, St. Paul, Minn., J. Nat Hamrick, Rutherfordton, N. C., Robert C. Howison, Jr., Raleigh, N. C., and Frank M. Wooten, Jr., Greenville, N. C., on brief), for appellants.

Murray Bring, Washington, D. C. (Arnold & Porter, Washington, D. C., Willcox, Hardee, Palmer, O'Farrell, McLeod & Buyck, Florence, S. C., on brief), for appellee Philip Morris, Inc.

Robinson, McFadden, Moore & Pope, Columbia, S. C. (Davis, Polk & Wardwell, New York City, on brief), for appellee R. J. Reynolds Tobacco Co.

Henry B. Smythe, Buist, Moore, Smythe & McGee, Charleston, S. C., Paul G. Pennoyer, Jr., Chester J. Hinshaw, Chadbourne, Parke, Whiteside & Wolff, New York City, on brief, for American Brands, Inc.

Richard E. Richards, Richards, Caskey & Richards, Lancaster, S. C., N. R. Coleman, Jr., Milligan, Coleman, Fletcher & Gaby, Greenville, Tenn., on brief, for The Austin Co., Inc. and Mullins Leaf Tobacco Co., Inc.

E. LeRoy Nettles, Nettles, Thomy, Floyd & Smith, Lake City, S. C., Norwood Robinson, Hudson, Petree, Stockton, Stockton & Robinson, Winston-Salem, N. C., on brief, for Brown and Williamson Tobacco Corp. and Export Leaf Tobacco Co.

Jack Nettles, McGowan, Nettles, Keller & Eaton, Florence, S. C., Howard Alder, Jr. and Larry D. Sharp, Bergson, Borkland, Margolis & Adler, Washington, D. C., on brief, for Dibrell Brothers Inc. and C. W. Walters Co., Inc.

D. Laurence McIntosh, Wright, Scott, Blackwell & Powers, Florence, S. C., Tommy W. Jarrett, Dees, Dees, Smith, Powell & Jarrett, Goldsboro, N. C., William R. Glendon, Guy C. Quinlan, Rogers & Wells, New York City, on brief, for Gallaher Limited.

C. Weston Houck, Florence, S. C., Z. Hardy Rose, Lucas, Rand, Rose, Meyer, Jones & Orcutt, Wilson, N. C., Fred D. Turnage, Cleary, Gottlieb, Steen & Hamilton, Washington, D. C., on brief, for Imperial Group Limited.

John W. Thomas, Roberts, Jennings & Thomas, Columbia, S. C., George R. Humrickhouse, John O. Peters, Samuel W. Hixon, III, Williams, Mullen & Christian, Richmond, Va., on brief, for J. P. Taylor Co. Inc., Universal Leaf Tobacco Co., Inc.

Joseph O. Rogers, Jr., Rogers, Riggs & Rickenbaker, Manning, S. C., on brief, for Liggett & Myers, Inc.

Douglas McKay, Jr., McKay, Sherrill, Walker, Townsend & Wilkins, Columbia, S. C., Joseph W. Gelb and H. Adam Prussin, Weil, Gotshal & Manges, New York City, on brief, for Loews Theaters, Inc.

Raymond W. Fullerton, Atty., U. S. Dept. of Agriculture, Washington, D. C. (James D. Keast, Gen. Counsel, J. Michael Kelly, Harold Carter, Asst. Gen. Counsels, John C. Chernauskas, Director Marketing Div., Edward M. Silverstein, Atty., Marketing Div., U. S. Dept. of Agriculture, Washington, D. C., Mark W. Buyck, Jr., U. S. Atty., Wm. Reynolds Williams, Asst. U. S. Atty., Columbia, S. C., on brief), for appellee Secretary of Agriculture of the United States.

Before HAYNSWORTH, Chief Judge, BRYAN, Senior Circuit Judge, and CRAVEN,* BUTZNER, RUSSELL, WIDENER and HALL, Circuit Judges, en banc.

DONALD RUSSELL, Circuit Judge:

This is an interlocutory appeal, pursuant to Rule 54(b), Fed.R.Civ.P., from an order denying class certification under Rule 23(b)(3), Fed.R.Civ.P., in a private action brought by certain South Carolina tobacco growers, who allege that the defendant tobacco companies and the Secretary of Agriculture violated Sections 1 and 2 of the Sherman Anti-Trust Act[1] during the years 1970 through 1974.[2] When the appeal was initially heard, the majority of the panel thought that the district court should have allowed the suit to proceed as a class action, at least on the issue of "violation."[3] However, we now conclude that the denial of class certification was not an abuse of discretion on the part of the district court. We therefore affirm.

This action concerns the sale at auction of flue-cured tobacco on the South Carolina markets. Flue-cured tobacco is a non-standardized or non-fungible commodity. It is raised in the Pee Dee section of South Carolina. Under a long established pattern of marketing, it is sold, when ready for market, at auctions conducted at some 36 warehouses in 11 geographic markets distributed throughout that section. All tobacco, before being offered for sale at auction, must be graded by government inspectors for the information of both sellers and buyers. These inspectors classify the tobacco within the range of 161 grades, depending upon the location of the leaf on the tobacco stalk, beginning with the top of the plant. Every buyer, however, has his own grading system. His classifications of grades are con-

---

* The opinion in this case was not prepared until after Judge Craven's death.

1. 15 U.S.C. §§ 1 and 2.

2. The district court's opinion is reported at 68 F.R.D. 641. For a comment on this opinion, see Note, *The Predominance Requirement: Antitrust Class Actions and the "Commercially*

*Unique" Product,* 27 *Syracuse L.Rev.* 1257 (1976).

3. The panel majority's opinion, along with Judge Bryan's dissent, is reported at 539 F.2d 1016. For a critique of the majority opinion, see 62 *Cornell L.Rev.* 177 (1976).

siderably less than those used by the government inspectors and vary from 10 to 32.

All tobacco is grouped, according to government grades, in individual piles weighing approximately 200 pounds each, and is offered for sale by an auctioneer at competitive bidding. The warehouses where the tobacco is brought, graded and sold are owned by independent individuals or concerns having no connection with the defendants. The auctioneer at the sales is employed by the warehouses and likewise has no connection with the defendants. Under the established procedure for bidding, a representative of the warehouse (known as a "starter") begins the bidding as each pile is offered for sale at the warehouse and the auctioneer proceeds from that point to receive bids in the normal auction manner from the prospective buyers present at the sale.

The defendants are buyers of flue-cured tobacco. Some purchase tobacco at all of the warehouses in the several South Carolina markets; others participate in the sales at only some of such markets and warehouses. There are other buyers than the defendants who are present and bidding at some or all of the South Carolina markets.

The prices which prevail at the auctions vary from day to day and are not uniform, even for tobacco which may be graded alike by government inspectors. Normally, these prices increase as the season progresses. To some extent this is because the early marketing generally consists of the lower grades commanding lower prices. As the marketing season continues, the grades generally increase in quality and market demand. Because of short supply, the price range between the lower and higher grades, however, had narrowed in the 1970's, which is the period involved in this lawsuit. Thus, in 1970, the average price on the South Carolina markets was 71.88 cents per pound; in 1974 it was 103.96 cents.

Just as there is a variation in price from market to market, from day to day, and from governmental grade to governmental grade, and even among grades, during a season, so there may be a considerable variation in the governmental grades for which the various buyers compete and in the quantities purchased by the different buyers from day to day on the various markets. Some buyers, for instance, do not bid on certain grades, because their principals do not use such grades in their processing, or they may already have purchased as much as they wish of those grades at that particular market. In such cases, the buyers either withdraw from the bidding or sharply curtail their bidding. An illustration of this situation is the experience at the Pamplico market during the marketing season of 1973. One of the defendants did not buy any tobacco at this market in 1973; another did not buy during a quarter of the sales days at such market in this period. A further indication of the fluctuations in purchases at this market is evidenced by the record of purchases during this same 1973 season by the defendant Reynolds at this market. Its percentage of purchases, on a daily basis, fluctuated widely between 1 per cent and 27 per cent of the sales. It is interesting, too, that the largest buyer at the market during that season, is not a defendant in this action.

At the bidding, it was not infrequent that the warehouseman would intervene to bid up the price of a particular pile of tobacco. He would do this to "stabilize" the market, as one warehouseman phrased it, that is, to stimulate the bidding. Should a seller, on the other hand, feel that his tobacco was being sold too cheaply he could withdraw it from sale and later reoffer it or put it under the support loan program to the Stabilization Fund, operated under the authorization of § 1445, 7 U.S.C. From time to time, the bidding for a particular pile of tobacco, particularly if of high quality, would end with a tie-bid from two or more of the buyers. Occasionally, this tie-bid might be broken by another buyer, who would intervene with a higher bid. More often, though, the auctioneer would, in case the tie was not broken, make a choice between the bidders and award the tobacco to one of the tie-bidders. In selecting the

tie-bidder to whom to assign the tobacco, the auctioneer would in many cases favor the bidder who had bid higher on the lower quality tobacco at that warehouse. The plaintiffs have disclaimed any intention of charging that the auctioneer participated in any way in any conspiracy to fix prices or to allot the tobacco according to any plan or agreement among the buyers; his complete impartiality is conceded.[4]

In their complaint seeking both individual and class relief, the plaintiffs set forth three separate causes of action under the anti-trust laws: The first asserted a conspiracy of the defendant companies, "with the knowledge, consent and acquiescence" of the Secretary of Agriculture to fix prices and rig bids on flue-cured tobacco at the South Carolina tobacco auction markets; the second, a conspiracy of the defendant companies, "with the knowledge, consent and acquiescence" of the Secretary of Agriculture, to monopolize these same markets by percentage purchase agreements and collusive bidding; and, finally, in conjunction with the Secretary of Agriculture, a conspiracy "to fix, control, and restrict" unreasonably "the amount of flue-cured tobacco which could be sold per day and per week in the auction warehouses," primarily by an inequitable assignment of inspectors to such warehouses as opposed to those assigned to warehouses in the Georgia market. To this complaint, all parties filed answers. In addition, the Secretary of Agriculture moved to dismiss but the motion was denied.

After joinder of issues, the plaintiffs moved to certify the action as a class action under Rule 23. Before passing on the certification issue, the district judge permitted full discovery on that issue alone, presided at the depositions of more than twenty witnesses heard during that discovery, and examined extensive documentary evidence produced.[5] On the basis of the record thus developed, he filed a comprehensive opinion containing what was described in the panel opinion as "full, precise, and apposite findings." In these findings, he concluded that the plaintiffs had not borne their burden,[6] that while the stan-

---

4. The plaintiffs describe tie-bidding in their brief as follows:

"* * * Tied bidding is a system by which buyers for the tobacco companies bid the same price for the tobacco offered on the market thereby tying the bid, and then receive a portion of the offerings by allocation."

This is inaccurate insofar as it suggests that the auctioneer makes his allocation pursuant to any conspiracy. As we have said, the record is clear and conceded by the parties that the auctioneer acts with complete impartiality and without any agreement with any defendant in choosing the successful bidder in connection with tied bids.

5. In *Doctor v. Seaboard Coast Line R. Co.* (4th Cir. 1976), 540 F.2d 699, 707, we said, quoting from *Huff v. N. D. Cass Company* (5th Cir. 1973), 485 F.2d 710, 713:

"'* * * The court may, and often does, permit discovery relating to the issues involved in maintainability, [of the action as a class action] and a preliminary evidentiary hearing may be appropriate or essential as a part of the vital management role which the trial judge must exercise in class actions to assure that they are both meaningful and manageable.'"

*See, also, Neely v. United States* (3d Cir. 1976), 546 F.2d 1059, 1071:

"* * * Before a ruling is made denying class action certification on unmanageability grounds, hard data should be presented to the district court as to the actual difficulty—or ease—involved in determining class membership and managing this proceeding."

6. It is well settled in this jurisdiction that the proponent of class certification has the burden of establishing the right to such certification under Rule 23. *Doctor v. Seaboard Coast Line R. Co., supra,* 540 F.2d at 706; *Carracter v. Morgan* (4th Cir. 1973), 491 F.2d 458, 459, *Poindexter v. Teubert* (4th Cir. 1972), 462 F.2d 1096, 1097.

The panel opinion stated that there was "almost a rebuttable presumption" in favor of class action treatment for anti-trust suits. 539 F.2d at 1021. This rule, if adopted, would operate to remove the burden of establishing right to class action treatment from the plaintiff in an anti-trust suit and impose it on the defendant or defendants. This would place anti-trust suits in a preferred position over even plaintiffs in discrimination cases. *Cf., East Texas Motor Freight System, Inc. v. Rodriguez* (1977), 431 U.S. 395, 398–401, 97 S.Ct. 1891, 1894–1895, 52 L.Ed.2d 453. We do not find this proposed rule supported by either authority or reason and do not adopt it. For a criticism of this panel ruling, *see,* 62 *Cornell L.Rev.* at 195–99.

dards of Rule 23(a) for class certification had been satisfied the requirements of 23(b)(3) that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and that a class action would be "superior to other available methods for the fair and efficient adjudication of the controversy" were not satisfied. Included as a part of his findings under 23(b)(3), was the finding that, if certified as a class action, the action would become unmanageable, because of the complexity of proof of injury and damage.[7] For those reasons, he concluded that the standards for certification as set forth in (b)(3) of Rule 23 could not be met and he denied certification.

 Primarily, the decision of the district judge turned upon a finding of the unmanageability of the action as a class action considered under the requirements of Rule 23(b)(3). In any review of either a grant or denial of class certification on grounds of manageability under Rule 23(b)(3), we must begin by recognizing the firmly established principle that the issue of manageability of a proposed class action is always a matter of "justifiable and serious" concern for the trial court and peculiarly within its discretion.[8] This is so because the issue is one of fact, subject to determination by the district court; it is "a practical problem, and primarily a factual one with which a district court generally has a greater familiarity and expertise than does a court of appeals. Consequently, it is an area in which the trial court must of necessity be granted a wide range of discretion."[9] And this is particularly true in actions governed by Rule 23(b)(3).[10] Accordingly, the plaintiffs in this appeal have the burden of establishing that the exercise of discretion by the district judge in denying, as he did, class certification was clearly wrong.

 It must be borne in mind, too, that there are three essential elements in every private anti-trust action: They are (1) a violation of the anti-trust law, (2) direct injury to the plaintiff from such violations, and (3) damages sustained by the plaintiff.[11] It follows, therefore, that a mere finding of violation does not result in liability. The statute gives a right of action only to the extent that one has been "injured in his business or property by reason of any-

---

**7.** Rule 23(b)(3) sets forth four nonexclusive factors to be considered in making findings on predominance and superiority:

"(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or understandability of concentrating the litigation of the claims in the particular forum; (D) *the difficulties likely to be encountered in the management of a class action.*" (Emphasis added)

*See, also, ibid.* 27 *Syracuse L.Rev.* at 1261, n. 26: "Predominance and superiority are considered jointly in assessing the manageability of actions under rule 23(b)(3)."

**8.** *Link v. Mercedes-Benz of N. Am., Inc.* (3d Cir. 1977), 550 F.2d 860, 864 (U.S. appeal pending).

*See* Note, 62 *Cornell L.Rev.* at 186:

"Whether the individual issues in a given class action are so extensive as to render the case too cumbersome for the court is a matter that rests in the discretion of the trial judge."

To that effect: *Barnett v. W. T. Grant Company* (4th Cir. 1975), 518 F.2d 543, 547; *Cypress v. Newport News General & Nonsectarian Hosp. Ass'n* (4th Cir. 1967), 375 F.2d 648, 653. And *see* Frankel, *Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39 (1967):

"* * * It [Rule 23] is neither a set of prescriptions nor a blue print. It is rather, a broad outline of general policies and discretions. * * * it confides to the district judges a broad range of discretion."

**9.** *Link v. Mercedes-Benz of N. Am., Inc., supra,* 550 F.2d at 864.

**10.** Rule 23, Fed.R.Civ.P., Advisory Committee's Note, 39 F.R.D. 98, 102 (1966).

**11.** *See, e. g., Zenith Corp. v. Hazeltine* (1969), 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129, *reversed on other grounds*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Miller Motors, Inc. v. Ford Motor Company* (4th Cir. 1958), 252 F.2d 441, 448, and *Kline v. Coldwell, Banker & Co.* (9th Cir. 1974), 508 F.2d 226, 230–1, *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

thing forbidden in the anti-trust laws." [12] The gravamen of the complaint is not the conspiracy; the crux of the action is injury, individual injury.[13] While a case may present a common question of violation, the issues of injury and damage remain the critical issues in such a case and are always strictly individualized.[14] As Professor Handler has aptly declared:

> "[The treble-damage remedy provided by Clayton Act § 4, 15 U.S.C. § 15] is . . limited by its [own] terms, the only person who may recover damages is one who had been 'injured in his business or property by reason of' a violation. The amount of his recovery, except for costs, is limited to 'threefold the damages *by him* sustained.' The language that Congress used in this statute . . . leaves no room for awarding damages to some amorphous 'fluid class' rather than, or in addition, to one or more actually injured persons. It likewise does not permit any person to recover damages sustained not by him, but by someone else who happens to be a member of such class." (Italics author's) (p. 37).

Generalized or class-wide proof of damages in a private anti-trust action would, in addition, contravene the mandate of the Rules Enabling Act [15] that the Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right." It follows that in determining manageability, the District Court must have in mind these essential elements of a private anti-trust action and the proof that may be required to establish these elements.[16]

■ As we have already stated, the district judge carefully and thoughtfully reviewed the facts and concluded that the issue of anti-trust violation did not predominate, that class action treatment was not superior to other available remedies in the case and, under the required standards of proof of the plaintiffs' action, class certification would render it unmanageable. He referred to the multiplicity of claimants who might be involved, the complexity of their claims as they would relate to injury and damages, and the highly individualized character the proof of injury and damages would assume, making necessary a mini-trial in all the individual claims, probably with a separate jury. He noted the numerous potential parties that might be injected into the action by class certification. Parties to whom notice would have to be given if class certification were allowed would, it seems, be above 20,000. The sheer cost of preparing a list of these potential parties was estimated at $30,000. The claims of the parties would involve thousands upon thousands of sales during four separate annual marketing seasons. Moreover, the claims could not be proved by any set method of mathematical or formula calculation but would require individual proof and trial, necessitating the examination of countless invoices, warehouse records, etc. In some cases, the calculation might be complicated, the district judge found, by the need to

**12.** 15 U.S.C. § 15; Handler, *Twenty-fourth Annual Antitrust Review,* 72 *Col.L.Rev.* 1, 37 (1972).

**13.** *Burnham Chemical Co. v. Borax Consolidated* (9th Cir. 1948), 170 F.2d 569, 571, *cert. denied,* 336 U.S. 924, 69 S.Ct. 655, 93 L.Ed. 1086 (1949).

**14.** It has been suggested that the two issues of injury and damage require a different standard of proof. Thus, Professor Areeda in "*Antitrust Violations without Damage Recoveries,*" 89 *Harv.L.Rev.* 1127, 1128 (1976) states that Courts "will insist upon a greater degree of proof of the *fact* of injury than would suffice for proof of the *quantum* of damages." (Italics author's).

**15.** 28 U.S.C. § 2072.

**16.** In addition to Professor Handler's article, see *Link v. Mercedes-Benz of N. Am., Inc., supra,* 550 F.2d at 871–72 (Gibbons, Jr., dissenting from refusal to hear interlocutory appeal); *Kline v. Coldwell, Banker & Co., supra,* 508 F.2d at 236, n. 8; *In re Hotel Telephone Charges* (9th Cir. 1974), 500 F.2d 86, 89–90, and *Eisen v. Carlisle & Jacquelin* (2d Cir. 1973), 479 F.2d 1005, 1112–14 (Eisen III), *vacated on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). *But see In re Sugar Antitrust Litigation* (E.D.Pa.1976), and Note, *Developments in the Law—Class Actions,* 89 Harv.L. Rev. 1318, 1532–36 (1976).

allow off-sets against the claims.[17] This problem is also increased not simply by the necessity of individual proof and calculation but also by the variety of claims as asserted by the various plaintiffs themselves arising out of the several violations alleged by the plaintiffs. Some of the plaintiffs complain only of tie-bids in connection with the court's finding on price-fixing and would restrict their damage claim accordingly. They express no objection to the auction system as conducted except as it results in a tie-bid, which they criticize as illegal because the tie-bid improperly converts, in their opinion, the auction into an allocation system. Others would predicate a claim upon the fact that the same government grade of tobacco may have sold at auction at different prices. Still others find price-fixing because the prices bid do not allow properly for increased costs of production. The monopoly charge, on the other hand, had to do, it may be assumed, more with the relative quantities purchased by several defendants at either one market or at all markets as evidence going to establish an allocation of the product on some agreed basis. The third count dealing with an alleged conspiracy to restrict the number of inspectors at any warehouse, thereby impeding orderly sales of tobacco as it matured, would involve proof that, as a result of the delays in marketing occasioned thereby, the quality of the grower's tobacco, which, so far as quality is concerned, is a perishable commodity, deteriorated, and the grower was forced to sell his tobacco at depressed prices because of its reduced grade. There is, also, some basis for assuming, as did the district judge, that, in some instances at least, any alleged conspiracy would relate, not to the over-all market area but to a single market in the area. In calculating any potential party's claim, the court thus would be required not simply to consider his individual sales on an individual basis, but to relate those sales to one of the conspiracy violations alleged by the plaintiffs. Confronted with this congeries of both separate allegations of conspiracy violations and individualized claims of injury and damage, all intertwined, the district judge found that, if he certified this action as a class action, the court would be swamped by an overwhelming deluge of mini-trials, in which the potential claimants would be entitled to a jury trial, and which would engage the time and attention of the court for years to come. He gave consideration to severance of issues but found that the resulting dilemma could not be resolved by any severing of issues. In view of the overwhelming nature of the individual claims and their complexity, he found, as we have said, that the issue of violation did not predominate nor was a class action a superior remedy in the case.[18]

The plaintiffs argue, however, that the district judge was "plainly wrong" in his denial of certification on the ground of manageability. In support, they assert that he rested his findings substantially on the difficulties of establishing injury and damages. Such a ground, in their view, will not justify a denial of class certification. There is no question, as they contend, that there are authorities which at least in result support this view.[19] On the other hand, there are equally respectable authorities in which certification of an anti-trust action was denied because of the complexity of, and the difficulties connected with,

17. That such an offset is appropriate in this connection, see Areeda, *ibid.,* at 1136.

18. *Cf. Newberry v. Washington Post Co.* (D.D.C.1976), 71 F.R.D. 25, 27:

"* * * From a class point of view, damages are the preponderant objective of this treble damage jury action. Determination of a violation or violations of the Sherman Act establishes nothing automatically as far as the measure of individual damage claims is involved."

19. *Barr v. WUI/TAS, Inc.* (S.D.N.Y.1975), 66 F.R.D. 109; *Weit v. Continental Illinois Nat. Bank & T. Co. of Chicago* (N.D.Ill.1973), 60 F.R.D. 5; *Wainwright v. Kraftco Corporation* (N.D.Ga.1972), 54 F.R.D. 532; *City of Philadelphia v. American Oil Company* (D.N.J.1971), 53 F.R.D. 45; *State of Minnesota v. United States Steel Corporation* (D.Minn.1968), 44 F.R.D. 559. Also see *In re Sugar Trust Antitrust Litigation, supra,* 73 F.R.D. 322, and *In re Plywood Antitrust Litigation,* 76 F.R.D. 570, (E.D.La. 1976).

the proof of individual injury and damages.[20] This conflict in result among the decisions seems to reflect more a factual difference in the cases themselves than a difference over legal principles.[21] Thus in cases where the fact of injury and damage breaks down in what may be characterized as "virtually a mechanical task," [22] "capable of mathematical or formula calculation," [23] the existence of individualized claims for damages seems to offer no barrier to class certification on grounds of manageability.[24]

On the other hand, where the issue of damages and impact does not lend itself to such a mechanical calculation, but requires "separate 'mini-trial,[s]" [25] of an overwhelming large number of individual claims, courts have found that the "staggering problems of logistics" [26] thus created "make the damage aspect of [the] case predominate," [27] and render the case unmanageable as a class action.[28] And this latter view accords with the purpose of Rule 23 which, was to "achieve economies of time, effort, and ex-

**20.** *Plekowski v. Ralston Purina Company* (M.D. Ga.1975), 68 F.R.D 443, 455, *mandamus denied,* 557 F.2d 1218 (5 Cir. 1977); *In re Transit Company Tire Antitrust Litigation* (W.D.Mo.1975), 67 F.R.D. 59, 75; *Hettinger v. Glass Specialty Co., Inc.* (N.D.Ill.1973), 59 F.R.D. 286, 294 (the damage and impact issue would create "a plethora of mini trials"); *Gneiting v. Taggares* (D.C.Idaho 1973), 62 F.R.D. 405, 407; *Chmieleski v. City Products Corp.* (W.D.Mo.1976), 71 F.R.D. 118, 156 (" * * * in antitrust cases in which damages * * * are a significant element in plaintiffs' class action claims and in which final relief relates predominantly to damages, certification under Rule 23(b)(2) is inappropriate"); *Newberry v. Washington Post Co., supra,* 71 F.R.D. at 27; *Wilensky v. Olympic Airways, S.A.* (E.D.Pa.1977), 73 F.R.D. 473, 477; *Trecker v. Manning Implement, Inc.* (N.D. Iowa 1976), 73 F.R.D. 554, 563; *Boro Hall v. Metropolitan Tobacco Co., Inc.* (E.D.N.Y.1977), 74 F.R.D. 142, 146.

**21.** Judge Gibbons in his dissent in *Link* at 877, states that the difference in the decisions on this point arise from the fact that a number of circuits deny class action treatment in those anti-trust cases "involving a large number of plaintiffs."

**22.** *Blackie v. Barrack* (9th Cir. 1975), 524 F.2d 891, 905, *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75.

See Note, *Developments, supra,* at 1513 and Practicing Law Institute, *Current Problems in Federal Civil Practice,* 491 (1975):
· "Where the damages are capable of mathematical or formula computation, the class action comes rather close to an ideal one and there is certainly no question of the lack of 'predominance' of the common questions."
*State of Illinois v. Harper & Row Publishers, Inc.* (N.D.Ill.1969), 301 F.Supp. 484, 489, *aff'd by equally divided court,* 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971), *reh. denied,* 401 U.S. 950, 91 S.Ct. 917, 28 L.Ed.2d 234, is an excellent illustration of this principle. In certifying the action for class treatment, the Court said:

"If illegal conspiracies raised prices to noncompetitive levels, the purchasers were affected in the same manner and to the same extent."
In *Blackie v. Barrack, supra,* 524 F.2d at 905, in finding that liability predominates over causation or damages, the Court said that "the process of computing individual damages will be virtually a mechanical task."

**23.** Practicing Law Institute, *Current Problems in Federal Civil Practice,* 491 (1975).

**24.** *See* cases cited in Note 22.

**25.** *Shaw v. Mobile Oil Corporation* (D.N.H. 1973), 60 F.R.D. 566, 570.
*See, also,* Note, 27 *Syracuse L.Rev.* at 1263–4:
"The uniformity of the quality and price of the product is also likely to have an impact on the manageability of the suit. When the product is homogeneous in nature, and has an unchanging price during the life of the alleged conspiracy, aggregate damage to the class may be easily determined from sales records for the relevant time period. However, an action involving a commodity available in different varieties or at fluctuating prices necessitates examining each sale to determine the defendant's total liability. In this situation a serious manageability problem arises: the court is likely to devote more time to individual damage issues than to what was believed to be the dominant issue, the existence of a conspiracy. To the extent that these problems arise in antitrust or other class actions, they render the trial 'a less fair and efficient method of adjudication than other available techniques,' such as the consolidation of individual actions by plaintiffs injured under identical circumstances."

**26.** *Ralston v. Volkswagenwerk, A.G.* (W.D.Mo. 1973), 61 F.R.D. 427, 433.

**27.** *Trecker v. Manning Implement, Inc., supra,* 73 F.R.D. at 563; *Shaw v. Mobile Oil Co., supra,* 60 F.R.D. at 570.

**28.** See cases listed in Note 20.

pense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."[29] The district court must accordingly consider in every case the effect of possible class certification on the judicial system itself. If the effect of class certification is to bring in thousands of other possible claimants, all of whom may assert individualized claims requiring mini-trials with juries, a procedure which "will be tremendously time-consuming and costly," the justification of class certification is absent especially so if the individual plaintiffs are financially able to prosecute individual actions, *Yanai v. Frito Lay, Inc.* (N.D.Ohio 1973), 61 F.R.D. 349, 353, or, if a "test case" approach will likely accomplish the same result under principles of collateral estoppel without involving the court in a morass of individual claims that will bog the court system down interminably. *Gelman v. Westinghouse Electric Corp.* (W.D.Pa.1976), 73 F.R.D 60, 68–9;[30] *Link v. Mercedes Benz, supra* 550 F.2d at 869 (Van Dusen, dissenting). Several of the plaintiffs testified categorically that, whether this action was certified as a class action, they were able financially to continue the suit and intended to do so. Their recovery, if their action is successful, is under the district judge's findings, sufficient to induce them to persevere in the prosecution of their action, whether class certification is granted or not.[31] There was accordingly no "death-knell" justification for class action certification. Indeed, it can well be argued that the individual actions, regarded as test cases, would be in this situation a superior procedure to a class action.[32]

**29.** The Advisory Committee's Note, 39 F.R.D. 69 at 102–3.

**30.** The bellwether case in this regard is *Katz v. Carte Blanche Corporation* (3d Cir. 1974), 496 F.2d 747, 755–761, *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974). This case was criticized in a case note in 88 Harv.L.Rev. 825, primarily because the author felt that collateral estoppel is a doctrine which can only be asserted defensively, never offensively. *See* p. 835. The same point is also made in the note on this case in 21 Wayne L.Rev. 1195. It is true that in *Blonder-Tongue v. University Foundation* (1971), 402 U.S. 313, 330, 91 S.Ct. 1434, 28 L.Ed.2d 788, the Court avoided deciding whether the collateral estoppel could be asserted offensively but the trend of modern decisions is clearly in the direction of finding that the principle may be used offensively and defensively. *Gerrard v. Larsen* (8th Cir. 1975), 517 F.2d 1127, 1130, n. 2; *Zdanok v. Glidden Company, etc.* (2d Cir. 1964), 327 F.2d 944, 955, *cert. denied,* 368 U.S. 814, 82 S.Ct. 56, 7 L.Ed.2d 22 (1961); *Lange v. Heglund* (W.D. Wash.1974), 391 F.Supp. 128, 130. There are, it is true, circumstances where the principle will not be applied either offensively or defensively. Thus, if in the earlier trial the party against whom it is asserted was denied a jury trial, that denial of his Seventh Amendment right makes it improper to permit the doctrine to operate. *McCook v. Standard Oil Company of California* (C.D.Cal.1975), 393 F.Supp. 256, 258. In this case, however, there is to be a jury trial and this exception will not apply.

**31.** The panel opinion suggests that the recovery by an individual plaintiff would be insufficient to induce him to persevere in an anti-trust suit absent certification. 539 F.2d at 1021, n. 1. There were, however, six plaintiffs whose average individual claims would be $16,000. When trebled their award ($6 \times \$16,000$), if they prevail, would be about $300,000, to which should be added an allowance of attorney's fees. That cannot be likened to the plaintiffs in *Eisen,* where the individual claim would be only a few dollars; the plaintiffs in this case would be entitled, if they won, to a substantial verdict. Class action cannot, therefore, be rationalized on any theory that unless granted, the action will die nor have the plaintiffs in their testimony so indicated—in fact, their testimony is exactly to the contrary.

**32.** It is obvious that the common law collateral estoppel rule if it is applied offensively on the basis of a judgment in a private test anti-trust suit, is far more advantageous to a party injured by an anti-trust violation than the prima facie rule of evidence created by § 5, on which the panel opinion sets so much store. § 5 merely creates at best a rebuttable presumption; the rule of collateral estoppel operates as *res judicata* of the issues decided. If § 5 is to be regarded as an argument for severance, to which we refer *infra*, collateral estoppel is a far more potent argument against severance and in favor of the test case route, which would mean the denial of class certification. And this would appear particularly so in this case where the plaintiffs, fully competent financially to maintain their individual actions, would undoubtedly find it difficult to finance the preparation of a list of the possible class members and the mailing of notices to such possible members.

The district court concluded, as we have seen, that in this case computation of damages would be a complex, highly individualized task, imposing an intolerable burden on the judicial system. As we have already indicated, he went to considerable pains to illustrate and pinpoint the difficulties that would be encountered and the reasons no mechanical or simple mathematical method of calculation was feasible. In view of these findings, which are clearly supported by the record, we think that there is a substantial basis for the district court's conclusion that there appears to be no workable formula to aid in computing the damages of each member of the plaintiff class and that the action was unmanageable as a class action.[33] The district court estimated —conservatively, we think—that, in the absence of a practical damage formula, determination of individual damages in this case could consume ten years of its time. The propriety of placing such a burden on already strained judicial resources seems unjustified.[34]

▮ Plaintiffs answer by declaring that they "expect" to develop a formula, which will simplify the computation of individual damages, at some later point in the litigation. Concededly, a district court should not decline to certify a class because it fears

that insurmountable problems may later appear.[35] But where the court finds, on the basis of substantial evidence as here, that there are serious problems *now appearing*, it should not certify the class merely on the assurance of counsel that some solution will be found. *See In re Hotel Telephone Charges, supra,* 500 F.2d at 90, where the Court said:

"The District Court in this case has relied on the 'imagination' of appellees' counsel to provide solutions that will, at some point in the future, prevent these individual issues from splintering the action into thousands of individual trials requiring years to litigate. Thus far the appellees have not been able to demonstrate to our satisfaction that the individual questions will not overwhelm the common questions . . . The issues raised by the apparent existence of numerous individual questions must be resolved *before* a class is certified, even if certification is conditional." [Emphasis added]

▮ Plaintiffs suggest another procedure which they contend would obviate the necessity of individualized proof of the fact and amount of damages. They argue that any difficulties created by that problem could be minimized by the simple expedient of bifurcating the trial, trying first

---

**33.** The author in 27 *Syracuse L.Rev.,* while finding some fault with the decision of the district court in this case, did conclude (p. 1284):

"In *Windham* the differing circumstances under which each claimant was injured made it clear that the action as it stood was not manageable."

**34.** *See, Schaffner v. Chemical Bank* (S.D.N.Y. 1972), 339 F.Supp. 329, where the Court said at p. 337:

". . . the notion of utilizing a jury trial in a class suit containing the varied problems certain to abound herein, is enough to chill any further discussion of the required superiority of a class claim over other available methods for the fair and efficient adjudication of the controversy. Such a trial, whether one trial or the multiple mini-trials probably required, would withdraw from all other usefulness for years to come the federal judicial personnel involved. Where one could muster jurors willing to devote themselves so indefinitely in time from their accustomed tasks, is puzzling. And one might relevantly

ask—what public interest would be served by devoting the public's facilities in this way and what just purpose requires such a colossal marshalling of judicial resources and their supporting personnel?"

*Kline v. Coldwell, Banker & Co., supra,* 508 F.2d at 238 (Duniway, J., concurring):

"Perhaps more important is the [if certified as a class action] practical effect of such a suit as this. The burden that it can impose on the court-discovery, pre-trial, notice to the classes, etc., and on a jury, if one is ever empanelled, is staggering. It is inconceivable to me that such a case can ever be tried unless the court is willing to deprive each defendant of his undoubted right to have his claimed liability proved, not by presumptions or assumptions, but by facts, with the burden of proof upon the plaintiff or plaintiffs, and to offer evidence in his defense. The same applies, if he is found liable, to proof of the damage of each 'plaintiff.' "

**35.** *Blackie v. Barrack, supra* (524 F.2d at 901).

the common issue of "liability" and then (if liability is found) trying the issue of damages either in one mass trial or in a series of mini-trials. The panel opinion would refine the concept of liability into the two elements of violation and injury or causation, and would find that the district judge was clearly wrong in not severing the issue of violation from the other issues in the case and directing a bifurcated trial.[36] It viewed the violation issue as presenting a considerably simpler issue than the other issues in the case and for that reason concluded that a class action would "not present unusual complexities at least so long as only issues of violation are before the tribunal." This view would give no consideration to the fact that generally " 'in a private antitrust suit there is no neat dividing line between the issues of liability and damages' " and because of the difficulty of establishing this " 'dividing line' " any severance of issues in such a case "must be

approached with trepidation."[37] In this case, there is such intertwining of the two issues of liability and damages but the panel opinion dismisses such fact with the observation that the "intertwined matters can be appropriately limited by the common sense, skill, and discretion of the trial judge." It is difficult to understand, though how a trial judge, however skillful, could deny or limit a litigant's right to offer *relevant* "intertwined matter," whether addressed to the issue of violation or that of injury and damage. Even more important: a trial judge cannot, in determining the manageability of a proposed class action, look exclusively to only one aspect of the case as the panel opinion seeks to do; he can and must look at the case as a whole and, as we have seen, consider proof of damages as well as other issues in the case.[38] In this case, it is obvious that no severance of issues could remove or even alleviate the overwhelming burden of dam-

**36.** The panel opinion was approved in the majority opinion in *Bogosian v. Gulf Oil Corp.* (3d Cir. 1977), 561 F.2d 434. We, however, for reasons hereafter stated, find the reasoning in Judge Aldisert's dissenting opinion more persuasive.

**37.** *Response of Carolina, Inc. v. Leasco Response, Inc.* (5th Cir. 1976), 537 F.2d 1307, 1324.

**38.** This suggestion apparently gives predominance to the issue of anti-trust violation over the issues of injury and damages in a private anti-trust suit. This, however, is contrary to the rule, already cited and repeated in case after case, that conspiracy to violate is not the crux of the private action. *Cf., also, Illinois Brick Co. v. Illinois* (1977), 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707. Even more serious, the suggested rule, if adopted, would in effect amount to an automatic severance of issues and class certification, whenever asked, in every private anti-trust action. This necessarily follows from the reasoning offered in support of the proposed rule, despite the panel opinion's guarded concession that there may be cases where the proposed rule would not apply. Moreover, the proposed rule poses serious problems of standing, which Judge Gibbons, who was inclined to favor the proposed rule, pointed out in his dissent in *Link v. Mercedes-Benz, supra* 550 F.2d at 876–8. That the difficulty foreseen by Judge Gibbons is real, *see* Sherman, *Antitrust Standing: From Loeb to Malamud,* 51 *N.Y.U.L.Rev.* 377, 400–401 (1976); Note, *Private Plaintiff's Standing Un-*

*der Clayton Act Section 4: Clothing the Naked Emperor,* 7 *Seton Hall L.Rev.* 588, 601–604 (1976); Note, 89 *Harv.L.Rev.* 1247 at 1256:

" * * * As the Supreme Court opinions on this issue demonstrate, however, the public interest [in a private antitrust action] is to be served indirectly by the private party's seeking redress for injuries to himself, rather than by deputizing him as a public representative. While the Court has consistently taken a broad view toward permitting a private party to receive adequate relief for his own harm, it has never suggested expanding the scope of relief beyond these private needs."

Accordingly standing has always been assessed on the basis of the plaintiff's right to recover, that is, on both liability and injury.

Taken to its extreme, the rule, as proposed in the panel opinion would in effect make class certification well nigh automatic. Taken to its extreme, a strict application of standing in determining right to severance, on the other hand, would result in an almost uniform rule against class certification. We recognize that there is some merit in both views but we believe that neither should be regarded as an absolute rule but the facts in each case should be carefully weighed and, after considering all aspects of the case, including the issues of injury and damages as well as of violation, the determination of class certification *vel non* should be made. And this decision should be made by the district judge, who has the greatest familiarity with the complexities of the case. His determination should only be reversed for clear error. This is the principle we

age mini-trials that class certification would impose on the judicial resources in this case.[39] Whether dealt with in a unitary trial or in a severed trial, the problem of proof of the individual claims and of the essential elements of individual injury and damage will remain and severance could only postpone the difficulty of such proof.[40] We think, therefore, it is well within the "wide range of discretion" granted the trial court to find that in this case bifurcation would not make the case manageable or warrant class certification.

■ Nor, as the district judge held, can the difficulties inherent in proving individual damages be avoided by the use of a form of "fluid recovery." Such a method of computing damages in a class action has been appropriately branded as "illegal, inadmissible as a solution of the manageability problems of class actions and wholly improper."[41] The district court found, as did Judge Gessel in *Newberry v. Washington Post Co., supra,* 71 F.R.D. at 27, that "[d]amage proof [in this case] would be unmanageable if the case proceeds as a class action," because there is no "easy formula" by which individual proof of damages may be avoided and that it was "undesirable and impractical for a jury to consider the issue of damages in a separate proceeding independent from the proceeding on liability." We cannot say that a

similar finding in this case was clearly wrong. The order of the district court denying class certification is accordingly affirmed.[42]

BUTZNER, Circuit Judge, dissenting:

I dissent for the reasons stated in the opinion Judge Wyzanski wrote for the panel in *Windham v. American Brands, Inc.,* 539 F.2d 1016 (4th Cir. 1976).

---

apply in deciding this case and it is the one we believe to be the better practice to follow.

**39.** Handler, *The Shift from Substantive to Procedural Innovations in Antitrust Suits in the Twenty-Third Annual Antitrust Review,* 71 *Col. L.Rev.* 1, 8, 9 (1971) [hereinafter cited as Handler, *"Twenty-third Review"*].

**40.** *See,* Handler, *Twenty-third Review, supra,* 71 *Col.L.Rev.* at 8:

"True, the facts may permit the court to sever the issue of liability and thus postpone discovery and trial on damages; but if the case is to be litigated, this problem will have to be faced eventually and the load the court will have to carry will not be reduced by the delay."

And *see In re Sugar Antitrust Litigation, supra,* 73 F.R.D. at 351:

"Bifurcation merely delays resolution of the problem until a later date. Hence, if actual individual damages need be proved, and if such determinations are so predominating that ponderous proof problems of individual

damages would tax a court's resources to an intolerable degree, a court would be justified in dealing with the damages enigma at the out set in making its determination as to whether a class action should be certified." *See, also Link v. Mercedes-Benz of N. Am., Inc., supra* 550 at 877; and Practicing Law Institute, *Current Problems in Federal Civil Practice,* 491–94 (1975).

**41.** *Eisen v. Carlisle and Jacquelin, supra,* 479 F.2d at 1018.

**42.** In the testimony taken, there were indications that many of the tobacco growers in South Carolina were unsympathetic to this action. The South Carolina boards of both the Grange and the American Farm Bureau branches in South Carolina had passed resolutions which appear to have expressed their disfavor of the action. We, however, have given no weight to these circumstances in our decision.