636 F.2d 933
 7 Fed. R. Evid. Serv. 713
 AMERICAN INTERNATIONAL PICTURES, INC.; Avco Embassy
Pictures, Inc.; Buena Vista Distribution Co., Inc.; Columbia
Pictures Industries, Inc.; Paramount Pictures Corporation;
Twentieth Century-Fox Film Corporation; United Artists
Corporation; Universal Film Exchanges, Inc.; Warner Bros.
Distributing Corporation, Appellees,
v.
PRICE ENTERPRISES, INC.; Azalea Drive-In Theaters, Inc.;
Chesapeake Drive-In Theaters, Inc.; Shore Drive Theaters,
Inc.; Peninsula Twin Drive-In Theater, Inc.; Twin Drive-In
Theater, Inc.; Drive-In Theaters, Inc., Appellants.
 No. 79-1751.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 12, 1980.
Decided Dec. 22, 1980.
 
 Stanley E. Sacks, Norfolk, Va. (Girard C. Larkin, Jr., Sacks, Sacks, Perkins & Larkin, Norfolk, Va., on brief), for appellants.
 Lewis T. Booker, Richmond, Va. (L. Neal Ellis, Jr., Hunton & Williams, Richmond, Va., on brief), for appellees.
 Before BUTZNER, Circuit Judge, FIELD, Senior Circuit Judge, and HALL, Circuit Judge.
 FIELD, Senior Circuit Judge:
 
 
 1
 Price Enterprises, Inc., and six other motion picture exhibitor corporations[1] appeal from judgments entered against them in the district court in favor of nine motion picture distributor corporations.[2] The judgments, based upon jury verdicts, aggregated $288,931 and included in that amount was $170,001 in punitive damages awarded against Price Enterprises, Inc.
 
 
 2
 The action was filed by the distributors, alleging that the defendant corporations, all under the control of Earnest H. Price, had engaged in a scheme or plan to defraud the distributors by submitting false and inaccurate statements with respect to gross admission receipts and the number of patrons admitted to theaters. The complaint further alleged that the defendants had failed to pay the distributors the full percentage rentals due on motion pictures licensed to them as required by the license agreements. In their answer, the defendants denied the allegations of the complaint and also asserted an antitrust counterclaim. Upon motion of the plaintiffs the district court severed the counterclaim for separate trial, and subsequently the defendants took a voluntary dismissal of their counterclaim.
 
 
 3
 The licensing agreements involved in this litigation were based upon well established procedures of the film distribution industry. Under these procedures the film rentals consist of a percentage of the gross revenue derived from the exhibition of a film over a designated period and, accordingly, the distributor's revenue is dependent upon the accurate reporting of gross admissions by the exhibitor. Under the usual formula the distributor calculates the film rental by applying an agreed percentage to the gross admissions as reported by the exhibitor. Incident to such an arrangement, the license agreements require that each patron receive a sequentially numbered ticket and that the cashiers record the ticket numbers issued on daily box office reports. Based upon this information the number of gross admissions is reported by the exhibitor on standard forms issued by the distributor for that purpose.
 
 
 4
 To ensure that receipts are reported accurately, the license agreements give the distributors the right to audit the exhibitor's books and records, including the daily box office reports and bank statements. In addition, the distributors have developed other procedures to test the accuracy of an exhibitor's reports, including the conduct of "open" and "blind" checks. An "open" check is conducted by an inspector who identifies himself to the theater manager and advises him that he is there to check the evening's receipts. Under a "blind" check, a distributor sends an inspector to count the attendance of a theater without the knowledge of the theater management, and the distributor then compares the checker's account against the box office receipts reported by the exhibitor for that date. In the present case the distributors conducted both "open" and "blind" checks of the entire chain of Price theaters, as well as audits of the exhibitor's books and records.
 
 
 5
 There is ample evidence in the record to support the jury's finding that the defendants were guilty of fraudulent conduct in consistently understating their gross receipts for the period from July 1, 1975, to June 30, 1979. Over four hundred "blind" checks were conducted during that period, and the gross admissions reported on the days of such checks were invariably substantially less than the gross receipts reported on "open" checking days. The evidence also showed that receipts from "late sales" were unreported and were not included in the cash receipts from other ticket sales deposited by the theater managers in their bank accounts. According to the evidence, the defendants also resorted to the sale of unreported strip tickets as well as the use of duplicate tickets to conceal their actual ticket sales. Audits of the defendants' records disclosed a variety of unexplained discrepancies, including deposits of substantial sums in undisclosed bank accounts of the defendants. This evidence was augmented by testimony of a number of former employees of the defendants, all of which demonstrated that the defendant theaters engaged in a deliberate course of conduct designed to defraud the distributors.
 
 
 6
 The defendants have raised a number of questions upon appeal, but only three of them merit any discussion. First, defendants challenge the action of the district court in admitting into evidence the reports of the "open" and "blind" checks prepared by the companies who conducted them. The court ruled that these reports were admissible under Rule 803(6), Federal Rules of Evidence, and we see no error in its action. The distributors were prepared to call as witnesses all of the 113 checkers responsible for the reports, and in advance of trial had identified each of them for the defendants. The district court permitted the introduction of the records subject to certain protective provisions, and in accordance therewith the officers of the checking companies authenticated the reports and detailed their procedures for the selection, training and supervision of the checking personnel. In our opinion, the defendants' objections to this evidence were directed to its weight, not its admissibility, and the district judge carefully charged the jury with respect to the weight and significance to be accorded the reports. We note that the admission of such evidence in a strikingly similar case was approved on appeal. L.C.L. Theatres v. Columbia Pictures Industries, 421 F.Supp. 1090 (N.D.Tex.1976), aff'd in pertinent part, 566 F.2d 494 (5 Cir. 1978).
 
 
 7
 The defendants also contend that it was error to permit Dr. Robert Peterson, an expert statistician, to testify relative to the damages sustained by the plaintiffs as a result of the defendants' inaccurate reporting. Dr. Peterson reached his conclusions by applying accepted statistical techniques to the evidence in the case, and while the defendants' statistician disagreed with Peterson's evaluations, such criticism was directed only to its weight and did not affect its admissibility. The court permitted the defendants to conduct an exhaustive cross-examination of Dr. Peterson and properly instructed the jury on the manner in which they should consider his testimony.
 
 
 8
 The defendants argue that the award of damages was based upon the "fluid recovery" theory, and suggest that such a basis was improper under our decision in Windham v. American Brands, Inc., 4th Cir., 565 F.2d 59 (1977). Windham, however, has no application to this case. The "fluid recovery" theory which would distribute damages to unspecified parties rather than to specific class members who were actually injured was rejected by us in that case as an improper solution to "the manageability problems of class actions". Id. at 72. This, of course, is not a class action and, in any event, there was no "fluidity" in the distribution of damages. The proof established that each of the distributors was injured by the misconduct of the defendants, and the discrete damages awarded to the plaintiffs were based upon apportionment of the gross damages as calculated from the evidence.
 
 
 9
 We have carefully considered the other assignments of error and find them to be without merit. Accordingly, the judgments are affirmed.[3]
 
 
 10
 AFFIRMED.
 
 
 
 [1]
 Azalea Drive-In Theaters, Inc. Chesapeake Drive-In Theaters, Inc. Shore Drive Theaters, Inc. Peninsula Twin Drive-In Theater, Inc. Twin Drive-In Theater, Inc. Drive-In Theaters, Inc
 
 
 [2]
 American International Pictures, Inc. Avco Embassy Pictures, Inc. Buena Vista Distribution Co., Inc. Columbia Pictures Industries, Inc. Paramount Pictures Corporation Twentieth Century-Fox Film Corporation United Artists Corporation Universal Film Exchanges, Inc. Warner Bros. Distributing Corp
 
 
 [3]
 During oral argument the question was raised from the bench as to whether an award of punitive damages against Price Enterprises, Inc., was appropriate under Virginia law since no compensatory damages had been assessed against that defendant. Since the issue was not raised in either the trial court or upon this appeal, we decline to consider the point. We note, however, that Price Enterprises, Inc., was a party to at least some of the licensing agreements and controlled all of the defendant corporations, and it occurs to us that these circumstances would have justified the entry of joint judgments for compensatory damages against Price Enterprises, Inc., and each of the exhibitor defendants