**Lorie Q. PRUITT et al., Plaintiffs,**

v.

**ALLIED CHEMICAL CORPORATION, a New York Corporation, Defendant.**

**Civ. A. No. 77–0035–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

Jan. 3, 1980.

---

9. *See* n.5 *supra.*

Oren R. Lewis, Jr., Thomas P. Jennings, Michael S. Marcus, Richard H. Jones, Arlington, Va., J. Vernon Patrick, Jr., Barton S. Sacher, Berkowitz, Lefkovits & Patrick, Birmingham, Ala., Thomas A. Williams, Callao, Va., Wescott B. Northam, Fears & Northam, Accomac, Va., for plaintiffs.

G. H. Grommel, Jr., Joseph M. Spivey, III, Hunton & Williams, Alan Rudlin, Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Twenty-nine named plaintiffs, all of whom are engaged in various facets of the commercial seafood industry in and about the Chesapeake Bay, filed this suit as a class action against the defendant, Allied Chemical Corporation ("Allied"). Plaintiffs allege, on behalf of themselves and all others similarly situated, that Allied, acting through its agent Life Science Products, Inc., discharged toxic effluents associated with the manufacture of Kepone, resulting in the pollution of the James River, the Chesapeake Bay, their tributaries, and adjacent waterways. Plaintiffs seek both injunctive relief and monetary damages for each member of the proposed class for losses sustained in trades and businesses which together comprise the commercial seafood industry in Virginia and Maryland.

The jurisdiction of this Court is invoked under 28 U.S.C. § 1332, premised upon the diversity of the parties' citizenship. Plaintiffs also cite the Court's federal question jurisdiction and admiralty jurisdiction under 28 U.S.C. §§ 1331 and 1333, respectively.

This matter comes before the Court on plaintiffs' renewed and amended motion for class certification under Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs filed an original motion for class certification in this action on January 24, 1977, which motion was initially denied pending further discovery of the plaintiffs' class action averments by defendant Allied. Additional named plaintiffs joined the action during the pendency of discovery on this matter. On July 18, 1977, plaintiffs filed a renewed and amended motion for class certification, to which Allied responded with a brief in opposition and a motion to dismiss with supporting brief. The parties argued their respective positions on the proposed class certification before the Court on Sep-

tember 7, 1977, after which the Court continued the motion for class certification and motion to dismiss under advisement. Finding it appropriate so to do, the Court in October of 1978 ordered plaintiffs to furnish the Court with various data concerning the size of certain subgroups of the proposed class. The parties again appeared in open court on December 18, 1978, to argue the motion for class certification. During January and February of 1979, the parties filed additional submissions with the Court in response to the Court's inquiries at that hearing. After what this Court finds to be extensive and superlative argument and briefing, with accompanying discovery taken on this matter, plaintiffs' motion for class certification is now ripe for disposition.

Plaintiffs seek the certification of the following class:

All persons (other than the named plaintiffs and intervenor-plaintiffs in *Adams v. Life Science Products Co.*, Civil Action No. 76–0031–R, U.S. District Court, Eastern District of Virginia)[1] who are residents of the Commonwealth of Virginia or the State of Maryland and whose livelihood or income is derived from, or dependent upon, the catching, taking, buying, selling, processing, packing, packaging, or distributing of seafood from the Chesapeake Bay, the James River, their tributaries, and adjacent water areas.

For the reasons which follow, the Court deems it inappropriate to certify the proposed class as a single class. Rather, the Court must divide the proposed class into distinct subclasses for certification so as to facilitate a manageable and fair adjudication of the plaintiffs' claims.

■ As a threshold matter, the Court concludes that a determination of class certification must be made without consideration of defendant's motion to dismiss the claim. Defendant's motion to dismiss requires an inquiry into the merits of the proposed class action, an inquiry which could potentially reduce the size of the class to more manageable numbers. As inviting as such a determination might be, the Court has no authority to conduct a preliminary inquiry into the merits of this suit in order to determine whether it may proceed as a class action, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732, 747–48 (1974); *Miller v. Mackey International*, 452 F.2d 424, 427 (5th Cir. 1971); *Briggs v. Brown & Williamson Tobacco Corp., Inc.*, 414 F.Supp. 371, 375 (E.D. Va.1976), such inquiry being in contravention of the purposes of Rule 23 of the Federal Rules of Civil Procedure. *Eisen, supra*, 417 U.S. at 177–78, 94 S.Ct. 2140; *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 545–46, 94 S.Ct. 756, 763, 38 L.Ed.2d 713, 720 (1974). In determining whether plaintiffs have met their burden of establishing the propriety of class certification, *Poindexter v. Tuebert*, 462 F.2d 1096, 1097 (4th Cir. 1972), the Court must thus restrict its exploration of the merits only as required to establish the satisfaction or nonsatisfaction of the requirements of Rule 23. *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1312–13 (4th Cir. 1978).

## RULE 23(a)

The prerequisites to a class action are set forth in Rule 23(a), which provides as follows:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the

---

1. The *Adams* suit is a nonclass action brought against Allied and others by James River watermen who earn their livelihoods from harvesting seafood from the James River and selling their catches to the seafood industry. Liability is asserted under negligence and intentional tort theories, as well as under violations of various Virginia and federal water and pollution control laws. The defendants in *Adams* are alleged to be responsible for the same Kepone pollution as is the subject of this suit. The *Adams* plaintiffs seek both compensatory and punitive damages for the damage to their businesses.

class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Addressing the four requirements seriatim, the Court concludes as follows:

*Numerosity*

 The proposed class members approximate 30,000 persons, according to the plaintiffs' own estimate.[2] By all authorities, this is a class so numerous that joinder would be impracticable. The Court makes this finding notwithstanding defendant's protests that some of the named plaintiffs have withdrawn from the case, that many of the class members will have no interest in class litigation, that the proposed class resides in a limited geographical area, and that some of the named plaintiffs may have damage claims below the requisite $10,000 jurisdictional amount. These factors do not overshadow the enormity of the proposed class. The requirement of numerosity is thus satisfied.

*Commonality*

 Plaintiffs' complaint alleges that all the members of the proposed class have been damaged by the impact of Kepone pollution on the Chesapeake Bay and James River seafood industry. The named plaintiffs contend that the alleged wrongful acts and omissions of defendant Allied, the asserted impact of Kepone pollution upon Chesapeake Bay seafood and the market therefor, and the measures necessary to ameliorate present pollution and to prevent future pollution, are questions of law and fact common to all members of the class. Defendant concedes that the questions of

whether the manufacturer of Kepone, Life Science Products, Inc., is liable to plaintiffs for its acts and omissions respecting Kepone discharges, and, if so, whether Allied is vicariously liable for those acts or omissions, are questions common to all members of the proposed class.

These common issues are alone enough to satisfy the Rule 23(a)(2) commonality requirement, "as the rule does not require a complete coincidence of legal claims. It requires only that there be *some* questions of law and fact in common." *Crockett v. Virginia Folding Box Co.*, 61 F.R.D. 312, 317 (E.D.Va.1974). This is not to say that the common questions of law or fact predominate over the individual questions peculiar to various subgroups of the proposed class. The question of the predominance of these common questions will be addressed with reference to subsection (b)(3) of Rule 23.

*Typicality*

The occupations of the named plaintiffs include fishermen, crabbers, oystermen, charter boat operators, marina owners, and seafood salesmen. All of the named plaintiffs are residents of either Virginia or Maryland, whose livelihoods depend, in whole or in substantial part, upon the seafood in the Chesapeake Bay and adjacent water areas. After consideration of the pleadings and discovery materials filed therewith, the Court is satisfied that named plaintiffs' contentions that defendant is responsible for polluting the waters and harming the supply and marketability of seafood in the Chesapeake Bay area are typical of the claims of the proposed class members.

---

2. In response to an inquiry by the Court, plaintiffs' counsel, by letter dated November 14, 1978, listed the approximate number of persons in each occupation purportedly represented in this action:

| | |
|---|---|
| Maryland Commercial Fishermen, Crabbers, etc. | 19,316 |
| Virginia Commercial Fishermen, Crabbers, etc. | 6,484 |
| Maryland Seafood Wholesalers-Retailers, etc. | 221 |
| Virginia Seafood Wholesalers-Retailers, etc. | 197 |
| Maryland Restauranteurs, etc. | 191 |
| Virginia Restauranteurs, etc. | 37 |
| Maryland Seafood Processors, etc. | 168 |
| Virginia Seafood Processors, etc. | 276 |
| Maryland Seafood Distributors, etc. | 347 |
| Virginia Seafood Distributors, etc. | Yet to be determined |
| Maryland Boat Owners, etc. | 226 |
| Virginia Boat Owners, etc. | 77 |
| Maryland Tackle (Shop) Owners, etc. | 82 |
| Virginia Tackle (Shop) Owners, etc. | 178 |
| Maryland Marina Owners, etc. | 194 |
| Virginia Marina Owners, etc. | 147 |

*Adequacy of Representation*

██ The requirement that the named plaintiffs in the instant case fairly and adequately represent the interests of the proposed class members has given the Court more concern than the other three 23(a) prerequisites. Defendant contends that several of the representative parties lack substantial or provable damages and therefore may not vigorously prosecute the suit on behalf of the entire class. The Court is nevertheless satisfied that the representative parties' damages are sufficient to ensure vigorous and adequate representation of the interests of the class. More importantly, however, the Court takes judicial notice of the fact that the presence of both Virginia and Maryland watermen on the same side of a dispute may constitute a rare occurrence indeed. Watermen, and particularly oystermen, from the two states involved here have been engaged in a commercial and territorial dispute, oftentimes violent in nature, for many years.[3] The presence of such unexpected co-litigants in this action has brought into question whether these conflicting commercial interests may prevent fair and adequate representation of the interests of the entire class by the named plaintiffs.

The Court concurs with Judge Fullam's reasoning in *Philadelphia Electric Co. v. Anaconda American Brass Co.*, 43 F.R.D. 452 (E.D.Pa.1968), that "more rigid requirements of representation should be imposed in alleged classes made up of members who, in everyday life, are likely to be in active competition with each other in matters closely related to the subject matter of the litigation." 43 F.R.D. at 463. Because of what the Court finds to be a very real potential for antagonistic competitive interests within the proposed class, the Court is not satisfied that the representative parties, all but two of whom are Virginia watermen, would fairly and adequately represent the interests of a class that is dominated numerically by Maryland watermen.[4]

## RULE 23(b)

Assuming, arguendo, that the representative parties could adequately and fairly protect the proposed class' interests, thereby satisfying Rule 23(a) prerequisites to a class action, plaintiffs must further meet the requirements of at least one of the subdivisions of Rule 23(b). Plaintiffs contend that this action should· be certified as a class action under either Rule 23(b)(1) or 23(b)(2), or, in the alternative, as a class action under Rule 23(b)(3). For the reasons stated hereinafter, the Court disagrees with plaintiffs on both counts.

## RULE 23(b)(1)

Rule 23(b)(1) provides for a class action where the risks of separate adjudications could prejudice the interests of (A) the party opposing the class, or (B) individual members of the class. Plaintiffs may bring this action as a (b)(1)(A) class action if prosecution of separate actions by individual class members would create a risk of inconsistent judgments, establishing incompatible standards of conduct for the defendant Allied. Plaintiffs claim that if class members pursue individual actions seeking both equitable relief and monetary damages, Allied runs the risk of separate judgments requiring inconsistent actions by it in satisfaction thereof.

██ As heretofore noted, Rule 23(b)(1) makes class actions appropriate where either the proposed class or the party opposing the class may be prejudiced by adjudicating separate actions. Subsection (b)(1)(A) is designed to protect the interests of the party opposing the class. Where

---

3. The so-called "Oyster War" between Virginia and Maryland watermen has reportedly been a fact of life in the Potomac River and Chesapeake Bay areas since 1785. The frequent outbreaks of violence in this century have received extensive media coverage in Virginia. *See, e. g.*, Richmond Times-Dispatch, December 20, 1956, February 22, 1957, April 10, 1959; Richmond News-Leader, December 23, 1954, January 25, 1955, December 10, 1956, March 6, 1957, April 15, 1959.

4. *See* n.2, *supra*. Of the nearly 30,000 proposed class members, well over 20,000 are Maryland residents.

that party does not seek the protection of a (b)(1)(A) class action, as Allied has chosen not to do in the present case, the availability of the class action asserted under Rule 23(b)(1)(A) is questionable. *Chmieleski v. City Products Corp.*, 71 F.R.D. 118, 155 (W.D.Mo.1976). The appropriateness of a class action under this subsection is further to be questioned in the instant case where monetary damage is the predominating relief sought by the class members. *See McDonnell Douglas Corp. v. United States District Court*, 523 F.2d 1083 (9th Cir. 1975), *cert. denied, sub nom. Flanagan v. McDonnell Douglas Corp.*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). Plaintiffs' complaint seeks from $850,000 to $2,550,000 in damages *per class member* on each of the twelve counts contained therein, plus $750,000,000 in punitive damages. In addition to, or in the alternative to the money damages sought, plaintiffs request "any equitable relief to [sic] which the Court may deem appropriate under the circumstances. . . ." Plaintiffs' failure to request any specific equitable relief, save a declaratory judgment of Allied's liability, and the nature of most of the named plaintiffs' claims as revealed in discovery, have convinced the Court that plaintiffs' lawsuit is one for money damages, with any equitable relief ancillary at best to the recovery thereof.

Should the class members seek individual judgments on such predominantly monetary claims, there is no recognizable danger of Allied being required to follow inconsistent or incompatible courses of conduct within the meaning of (b)(1)(A). *See LaMar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973). The possibility that some class members may establish their claims in their individual suits and others may not is not the risk of incompatible standards of conduct which the rule was intended to guard against. *Chmieleski v. City Products Corp., supra* at 155; *Bogosian v. Gulf Oil Corp.*, 62 F.R.D. 124 (E.D.Pa.1973). Plaintiffs' speculation of inconsistent equitable remedies which could be sought in individual suits[5] does not persuade the Court that separate adjudications of the kinds of claims brought *in this complaint* would pose the risk of incompatible judgments against Allied. *See McDonnell Douglas Corp. v. United States District Court, supra* at 1086.

The Court likewise finds a Rule 23(b)(1)(B) class action ill-suited to the present case. Subsection (b)(1)(B) provides for a class action in cases where separate actions by class members could prove dispositive or prejudicial to the interests of other class members not party to those adjudications. Plaintiffs again speculate about inconsistent equitable remedies which might be sought and granted in individual suits, thereby impairing the interests of many class members. In addition, plaintiffs contend that their monetary claims will, if successful, bankrupt Allied, making a class action necessary under subsection (b)(1)(B) to apportion the defendant's limited funds. Finally, plaintiffs argue that the expense of individual suits would be prohibitive to the class members.

The Court is satisfied that individual adjudications of the type of claims asserted in plaintiffs' complaint would not substantially impair the proposed class members' ability to protect their interests. Without confronting the merits of plaintiffs' equitable prayers in the instant complaint, it suffices to say that a general request for "any equitable relief" in the alternative to extremely high monetary damages does not pose the risk of prejudicial judgments which constitutes a qualification for Rule 23(b)(1)(B) class action

---

5. In the memorandum in support of their motion for class certification, plaintiffs suggest various incompatible equitable remedies which might be sought by the various class members. The remedies mentioned include an injunction against defendant Allied enjoining any present or future discharge of Kepone effluents, a mandatory injunction requiring Allied to remove Kepone from the affected waterways, and a decree apportioning the damages sought in this action among the plaintiffs and proposed class members in the event they cannot be fully compensated by defendant for their alleged injuries. Plaintiffs argue that incompatibility could result should Allied be required to mitigate the pollution damage for one set of plaintiffs to the detriment of another set.

treatment, especially where other qualifications are absent. The *stare decisis* effect of an adverse judgment in an individual action is not the prejudice addressed by subsection (b)(1)(B). *LaMar v. H & B Novelty & Loan Co., supra* at 467. Similarly, the allegation that the damages sought by plaintiffs would far exceed any funds available to Allied for payment thereof is an insufficient premise for the establishment of class action. Discovery and affidavits filed in this matter have revealed that many plaintiffs' actual damages are at best a small fraction of the exorbitant sums requested for each claimant in every count of the complaint. The fanciful damage figures contained in the complaint cannot qualify plaintiffs' suit as a class action, else any large damage prayer would require Rule 23(b)(1)(B) treatment, regardless of the absence of any factual support for such damages. Such a result was never intended by the drafters of Rule 23.

 The Court also gives little weight to plaintiffs' contention that the expense and complexity of multiple trials merit subdivision (b)(1)(B) treatment. Plaintiffs misconstrue the type of protection offered by Rule 23(b)(1)(B). Class members' substantive rights of action against a defendant are guarded when necessary by the certification of a class action under subdivision (b)(1)(B). Those rights are not substantially impaired, however, by the burden and expense of having to institute individual actions. *McDonnell Douglas Corp. v. United States District Court, supra* at 1086. ("At worst, individual actions would leave unnamed members of the class with the complexity and expense as if no prior actions had been brought.")

## RULE 23(b)(2)

 Plaintiffs also seek, in the alternative, to proceed on behalf of their proposed class under subsection (b)(2) of Rule 23. An action may be maintained as a class action under Rule 23(b)(2) if, in addition to the satisfaction of the subsection (a) prerequisites, "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . ." Plaintiffs contend that because Allied has allegedly caused the so-called "Kepone pollution" of the Chesapeake Bay and James River areas and might be requested in this suit to cease polluting these water areas and to remedy the effects of prior pollution, and because plaintiffs seek a declaratory judgment of Allied's liability, then any injunctive relief deemed appropriate will by necessity apply to the class as a whole, making this suit appropriate for subdivision (b)(2) treatment. The Court disagrees.

The Advisory Committee Note to the 1966 amendments to the Federal Rules of Civil Procedure suggests the reach of subdivision (b)(2):

> This subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate. Declaratory relief "corresponds" to injunctive relief when as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief. The subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.

Advisory Comm. Note, 39 F.R.D. 69, 102 (1966). Subdivision (b)(2) has traditionally been invoked in the civil rights field to secure injunctive relief from unlawful discrimination against a class of persons. As the Advisory Committee's Note explains, (b)(2) is not limited to civil rights cases, but may also be appropriate, for example, in *consumer-related cases contesting the legality of certain commercial actions by sellers. Id.* The instant action against Allied neither fits the paradigm subsection (b)(2) model of civil rights protection nor does it fall within any logical extension of this section's reach.

The primary obstacle to plaintiffs bringing this suit as a (b)(2) class action is the predominance of monetary damages. As noted above, plaintiffs seek from $850,000 to $2,550,000 in each of the twelve counts in their complaint for each of the nearly 30,-000 proposed class members, totalling in excess of several hundred billion dollars of potential liability. Almost as an afterthought, plaintiffs ask for such equitable relief as the Court deems appropriate in addition to the monetary relief. This action is clearly one in which the appropriate final relief relates predominantly to money damages, a case outside the scope of subsection (b)(2) according to the Advisory Committee's Note cited above. Courts have, without exception, followed the Advisory Committee's suggestion by denying at the outset subsection (b)(2) certification where money damages are the primary relief sought. *See Lukenas v. Bryce's Mountain Resort, Inc.*, 538 F.2d 594 (4th Cir. 1976); *McDonnell Douglas Corp. v. United States District Court, supra; Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Causey v. Pan American World Airways, Inc.*, 66 F.R.D. 392 (E.D.Va.1975). Only where the monetary relief is ancillary to a request for declaratory or injunctive relief have courts shown a willingness to grant (b)(2) certification to a suit involving a monetary award. *See Robinson v. Lorillard Corp.*, 444 F.2d 791, 801–02 (4th Cir.), *cert. dismissed*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); *Harper v. Mayor and City Council of Baltimore*, 359 F.Supp. 1187, 1192 n.1 (D.Md.), *modified sub nom. Harper v. Kloster*, 486 F.2d 1134 (4th Cir. 1973).

Plaintiffs, while conceding that money damages predominate, invite the Court to adopt the approach of Professors Wright and Miller to subsection (b)(2) and certify the present suit as a (b)(2) class action simply because injunctive relief is requested. *See* 7A Wright & Miller, *Federal Practice and Procedure*: Civil § 1775 at 12 (1972). Professors Wright and Miller suggest that disputes over whether an action is primarily for injunctive relief or declaratory relief rather than a monetary award are counterproductive and that a suit should be allowed to proceed under (b)(2) as long as injunctive or declaratory relief has been requested. In light of the case precedent in this circuit and the clear legislative intent behind subsection (b)(2), and in light of the fact that preposterous monetary damages are sought with no specific equitable relief mentioned, the Court will decline to apply the learned professors' suggestion in the instant case.

## RULE 23(b)(3)

Plaintiffs seek, in the alternative to attaining 23(b)(1) or (b)(2) class certification, to maintain this suit as a class action under 23(b)(3). Subsection (b)(3) sanctions class certification where the subdivision (a) prerequisites are satisfied, and:

> [t]he Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Maintenance of a (b)(3) class action entails the cost of mandatory notice to the class members of the nature of the suit and of their option to exclude themselves from the class, a cost which is not incurred in a (b)(1) or (b)(2) class action and which apparently persuaded plaintiffs to request (b)(3) class certification only as a last resort. For the reasons heretofore stated, the Court has found this action ill-suited for (b)(1) or (b)(2) class action treatment. Plaintiffs' suit may proceed as a class action, therefore, only if the Court finds that plaintiffs have satisfied the requirements of subsection (b)(3).

### Predominance

The first requirement for bringing a subsection (b)(3) class action is that the Court finds that questions of law and fact common to the class as a whole predominate over questions affecting only subgroups or individuals within the class. The parties are in apparent agreement that the

questions of Allied's responsibility for the Kepone pollution of Virginia and Maryland waterways, the pollution's effect on marine life, and the measures necessary to ameliorate the pollutant's harmful effect, are common to all of the members of the proposed class. Defendant Allied argues, however, that plaintiffs' suit entails a multitude of individual determinations inapplicable to the class as a whole, which predominate over the common issues. Allied cites four separate categories of questions which affect only certain members of the proposed class: (1) differing theories of causation and liability, (2) differing defenses, (3) individualized damages determination, and (4) choice of law difficulties.

Initially, plaintiffs have asserted several causes of action against Allied, including trespass, nuisance, negligence, and statutory violations. Allied contends that no single cause of action may be asserted by the class as a whole or by any easily defined subgroup of the class. For example, Allied points out that a cause of action for trespass requires a showing of some property interest in the property trespassed upon—a showing which may be met by the lessees of oysterbeds, but certainly not by packagers and processors of seafood. A cause of action for a private nuisance requires the same kind of showing of a property interest to establish an interference with the use and enjoyment of that property. Plaintiffs' negligence claims entail a showing of foreseeability and proximate causation which may vary across the class. Allied may be held to have foreseen damage to fishermen by its discharge of pollutants into the James River, but may not be held responsible for anticipating harm to those plaintiffs whose livelihoods are further removed from the direct harvesting of the marine life, such as packagers and restauranteurs. Similarly, Allied argues that a showing of

proximate cause would necessarily involve varying degrees of direct harm from the pollution depending upon the plaintiffs' locations along the affected waterways, see *Boring v. Medusa Portland Cement Co.*, 63 F.R.D. 78 (M.D.Pa.) *app. dismissed sub nom. Appeal of Boring*, 505 F.2d 729 (3d Cir. 1974), and the varying impact of the publicity surrounding the Kepone pollution, depending upon each plaintiff's location and livelihood. Plaintiffs, asserting statutory remedies, must establish not only a violation of the relevant statutes, but also their membership in the class protected by that statute; a showing which may not inure to the benefit of the class as a whole.

Secondly, just as causation and liability questions may vary among the class members, so may the defenses to the various causes of action. For example, Allied's proposed defense of intervening causes, more particularly of Governor Godwin's closure of certain sections of the James River and Chesapeake Bay, will apply only to those plaintiffs located in the areas affected by the respective intervening cause.

Thirdly, any defense of a plaintiff's failure to mitigate damages will have to be determined on an individual basis. The plaintiffs' damages will also require individual showings of losses which Allied argues will reduce a class action to a series of innumerable mini-trials. When viewed in this light, Allied argues, plaintiffs' proposed class action resembles the "mass accident" which the Advisory Committee's Note and this Court in *Causey v. Pan American World Airways, Inc.*, *supra*, suggested should rarely be accorded class action treatment due to the likelihood that significant questions of liability, defenses thereto, and damages would be present which would affect the individual class members in different ways.[6]

---

6. The Advisory Committee Note following the 1966 amendments to Rule 23 suggests that:

> A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to lia-

bility, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried. . . .

Advisory Comm. Note, 39 F.R.D. 69, 103 (1966).

Lastly, Allied points to the variety of locations and occupations represented by the plaintiffs as posing conflicts of law problems within the class. The Court may be required to assert admiralty jurisdiction over those plaintiffs who engage in traditional maritime activities, which under the precedent in this circuit may not include but a small fraction of the proposed class. Determinations of the applicability of admiralty jurisdiction will also depend upon such individualized considerations as the situs of the business injury and the scope of the particular maritime activity affected. A choice between federal maritime tort law and non-maritime tort law may further divide the class. Finally, the presence of both Virginia and Maryland residents may involve the Court in choices of state law as well.

Defendant Allied contends that these questions affecting only varying subgroups of the proposed class predominate over the questions common to all class members. The Court concurs. The Court finds the instant case analogous in many ways to the class action proposed in *Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). The proposed plaintiff class in *Windham* consisted of nearly 20,000 South Carolina tobacco growers who alleged that several tobacco companies and the Secretary of Agriculture had violated federal anti-trust laws in the purchase at auction of flue-cured tobacco. The United States Court of Appeals for the Fourth Circuit affirmed the district court's denial of class certification, citing the multiplicity of claimants, the complexity of their claims, and the highly individualized character of the proof of injury and damages as outweighing the common question of anti-trust violation.

The Fourth Circuit noted that a showing of an anti-trust violation would not establish the defendants' liability for any of the plaintiff class' damages, which would require additionally a showing of direct injury to each plaintiff and damages sustained therefrom. *Id.* at 65, 66. Similarly, a showing by the watermen of Allied's pollu-tion of the James River and Chesapeake Bay would not establish that Allied is liable to the plaintiffs as a result of that pollution. As in *Windham*, the issues relevant to liability, *i. e.*, injury and damages, may vary from class member to class member as detailed above.

A finding that common questions of law or fact do not predominate over the questions affecting only individuals within the class does not, however, end the Court's inquiry. Subsection (c)(4) of Rule 23 provides that:

> When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly.

Rule 23(c)(4) requires the Court to consider employment of these restructuring measures where an apparently unmanageable class action could be converted to a manageable one. *See Geraghty v. United States Parole Commission*, 579 F.2d 238, 253 (3d Cir. 1978), *cert. granted* 440 U.S. 945, 99 S.Ct. 1420, 59 L.Ed.2d 632 (1979) ("A forbearance to consider these options constituted a failure properly to exercise discretion.") This subsection provides the Court with the flexibility and the authority to "treat common things in common and to distinguish the distinguishable." *Jenkins v. United Gas Corp.*, 400 F.2d 28, 35 (5th Cir. 1968).

Having found that the individual questions of foreseeability of harm and impact of pollution, of intervening cause defenses, and of choices of applicable law predominate over questions common to the entire class, the Court must determine whether the proposed class may be subdivided under (c)(4) so that well-defined subclasses may present common questions concerning Allied's liability for the subclasses' damages. The Court has concluded that six distinguishable subclasses within plaintiffs' proposed class merit separate class action treatment due to the predominance of com-

mon questions among their respective members.

The first subclass consists of all proposed class members directly involved with the harvesting of seafood from the James River, Chesapeake Bay and adjacent waterways. This group would include commercial fishermen, crabbers, clammers, shellfishermen, oyster tongers, lessees of oyster beds, and employees of same, all of whom earn their livelihood by catching seafood and selling their catches to the commercial seafood industry. This subclass shares common questions of Allied's foreseeability of harm and the impact on business from the pollution and publicity surrounding it, as all its members are directly involved in the catching and selling of seafood from the affected waterways. The applicability or nonapplicability of admiralty jurisdiction as well as of maritime or non-maritime tort law should be uniform throughout the entire subclass. Because of the additional problems regarding choice of state law, Maryland or Virginia, in addition to the Court's aforementioned skepticism concerning the adequacy of representation of the Maryland plaintiffs' interest by the named plaintiffs, the Court deems it prudent to exclude all plaintiffs who reside in Maryland from this and all other subclasses. Finally, because of the potential intervening cause defense based on Governor Godwin's closures of parts of the James River and Chesapeake Bay, the Court will further halve this subclass of fishermen into classes comprised of those affected by the closure orders and those unaffected by them.

Another distinguishable subclass of plaintiffs consists of businessmen whose livelihoods are more indirectly involved with the catching of seafood. This group would consist of boat owners, captains and crewmen, tackle owners and bait owners, marina owners and operators, and employees of the same, all of whom earn part or all of their livelihood by offering their services or equipment, for sale or hire, to persons who attempt to catch seafood in the affected waters. As with the subclasses of fishermen, this group should be further divided according to the applicability or nonapplica-

bility of Allied's defense involving the closure of parts of the James River and Chesapeake Bay. When divided as such, these two subclasses would present common questions regarding causation and impact, foreseeability of harm, and applicable law, which would predominate over any questions of fact or law affecting only particular members of the subclasses.

Another group which the Court has found distinguishable from other class members consists of businessmen in the seafood industry who purchase seafood caught in the waters affected by the pollution and who process, prepare or otherwise distribute the seafood to the public or to others in the commercial seafood industry. The class members represented in this subclass would be seafood wholesalers and retailers, seafood processors and packagers, distributors, and restauranteurs, and the employees of same, whose livelihoods are based in whole or in part on the purchase for resale to the public or for distribution of seafood from the affected waterways. Because these seafood dealers and restauranteurs may have been variously affected by the closure of the James River and Chesapeake Bay to fishermen from whom seafood is purchased, this group will also be divided into two subclasses of those affected and those unaffected by the closure orders. Again, questions of the foreseeability of harm to these businessmen situated further along in the chain of commercial seafood marketing, as well as the questions of applicable law and causation, should be uniform throughout these two subclasses.

The Court acknowledges that the lines of demarcation between these six subclasses are not as clear as the Court may have indicated. The pleadings and discovery taken on the matter of class certification have revealed that many members of the latter two subclasses of dealers and distributors were also involved directly in the catching of the seafood, and therefore would qualify for representation in one of the two subclasses of fishermen. Similarly, many members of the two subclasses of fishermen were also participants in the dis-

tribution, preparation or sale to the public of the seafood caught, and would thereby qualify for representation in one of the two subclasses of dealers and distributors. Such cross-overs do not, however, preclude certification of the individual subclasses, as those plaintiffs belonging to more than one subclass may be represented in more than one, *see Schmidt v. Interstate Federal Savings & Loan Assn.*, 74 F.R.D. 423 (D.D.C. 1977), or may opt out of however many subclasses they choose.

▇▇ The subclasses as delineated above present, individually, common issues of recovery for any damage sustained from Allied's discharge of pollution into the James River. While there still exist several questions affecting only individuals within the subclasses, the Court is of the view that the questions common to the members of each subclass predominate over the questions that divide them. Subsection (b)(3) of Rule 23 requires only that the common questions outweigh the individual questions; they need not be dispositive of the entire litigation. *Dolgow v. Anderson*, 43 F.R.D. 472, 490 (E.D.N.Y.1968), *aff'd* 464 F.2d 437 (2d Cir. 1972). The presence of issues concerning individual plaintiffs' damages and the defenses thereto, however, requires the Court to employ the second device under Rule 23(c)(4) of bifurcating the class actions here certified between liability issues and damage issues. Severing these issues will allow each class to establish, if they can, Allied's liability to the class as a whole, while reserving the proof and computation of individual plaintiffs' damages, as well as any defenses such as failure to mitigate damages, for a later proceeding. This procedure, often referred to as a partial class action, was recommended in the Advisory Committee's Note accompanying the 1966 amendments of Rule 23, 39 F.R.D. 98, 106, and has been utilized by federal courts in class actions where, as here, the advantages and economies to be achieved by a single adjudication of common issues recommends class action treatment of those issues. *See Samuel v. University of Pittsburgh*, 538 F.2d 991 (3d Cir. 1976); *Bing v. Roadway Express, Inc.*, 485 F.2d 441 (5th Cir. 1973);

*Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir. 1968), *cert. denied* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). *See generally* 7A Wright & Miller, *Federal Practice & Procedure*: Civil § 1790 at 187–88 (1972) and cases cited therein.

When broken down into these subclasses and when liability issues are severed from the damages determinations, this "mass accident" is properly maintainable as a class action. This Court in *Causey v. Pan American World Airways, Inc., supra* at 397, held that mass accident cases should not be accorded class action treatment unless (1) the class action is limited to the issue of liability, (2) the class members support the action, and (3) the choice of law problems are minimized by the accident affecting plaintiffs in the same jurisdiction. By excluding the Maryland proposed class members and by bifurcating liability and damages questions, the Court has, hopefully, ensured satisfaction of these requirements.

*Superiority*

In addition to finding that common questions of law and fact predominate within a proposed class, Rule 23(b)(3) requires that the Court find that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Having found that common questions predominate within each of the six subclasses described above, the Court must further be satisfied that no other judicial procedure, short of settlement, is superior or equal to class action treatment of these plaintiffs' claims.

Subsection (b)(3) of Rule 23 suggests a non-exclusive list of four matters pertinent to a determination of superiority:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

With reference to the factors listed above, Allied argues that certification of the class proposed by the named representative plaintiffs would not facilitate a superior method of adjudicating the class' claims. While Allied's arguments against a superiority finding were made not with regard to the subclasses as set out above, the Court finds that they have sufficient relevance to the superiority of subclass certification as to warrant consideration under the posture of the case as it stands in light of the Court's previously pronounced conclusions.

Allied contends initially that the existence of the *Adams* action [7] against it provides a strong indication both of the interest of class members in individually controlling the prosecution of separate actions and of the likelihood that a class certification will not prevent multiple lawsuits. Allied's position is apparently that because the plaintiffs in *Adams* are watermen pursuing similar claims under similar theories of relief, the fishermen, seafood dealers and distributors, and restauranteurs represented by the named parties here may also wish to maintain separate actions. The Court is persuaded that *Adams* neither signifies any preference among the proposed class members for separate adjudications nor threatens duplicative lawsuits. On the contrary, the fact that the present suit was filed subsequent to the *Adams* suit, the absence of any showing of defections from the proposed class to *Adams* or any other action against Allied, and statements made in discovery by many proposed class members, indicate to the Court that there is a prevalent interest among the plaintiffs in maintaining the proposed class action over any other method of adjudication.

 Allied argues in addition that the multiplicity of legal theories and individual fact patterns presented by the proposed class renders a class action unmanageable. Allied persuasively argues that the variety of claims brought by the class will make a class action particularly burdensome here due to plaintiffs' request for a jury trial. The Court acknowledges that manageability of these actions, even when brought separately by the six subclasses, is the greatest obstacle for plaintiffs to overcome in attaining class certification, an obstacle made even more pronounced by their jury request. A finding that common questions of law and fact predominate over questions affecting individuals does not necessarily compel a finding that a class action involving those issues would be manageable or even practical in light of the finite capacities of juries to absorb complex legal and factual issues. *Cf. Gneiting Taggares*, 62 F.R.D. 405, 406–407 (C.D.Idaho 1973).

Finally, Allied contends that the damages aspect of this action, whether handled in conjunction with or separately from the liability aspect, does not lend itself to class action treatment. This argument also addresses the manageability consideration of subsection (b)(3), a consideration that is not required under subsections (b)(1) or (b)(2) class actions. Allied argues that class members will have to prove damages individually in innumerable damages mini-trials which will prove unreasonably burdensome to the Court and to the parties. Plaintiffs suggest a type of "fluid recovery" procedure whereby the Court or jury would determine the total or aggregate damages sustained by the plaintiff class, after which individual class members would submit their respective claims for participation in that fund. *See Dickinson v. Burnham*, 197 F.2d 973 (2d Cir.), *cert. denied* 344 U.S. 875, 73 S.Ct. 169, 97 L.Ed. 678 (1952); *Daar v. Yellow Cab Co.*, 67 Cal.2d 695, 63 Cal.Rptr. 724, 433 P.2d 732 (1967). While such a procedure provides for substantial savings of judicial resources, its legal validity as well as its logical applicability to the instant case are questionable. The United States Court of Appeals for the Second Circuit has declared the concept of fluid recovery to be "illegal, inadmissible as a solution of the manageability problems of class actions and wholly improper." *Eisen v. Carlisle and Jacquelin*, 479 F.2d 1005, 1018 (2d Cir. 1973) (*Eisen III*) *vacated on other grounds*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732

---

**7.** *See* n.1, *supra.*

(1974). The United States Court of Appeals for the Fourth Circuit has held that class certification may be inappropriate where the proof of injury and damage is not reducible to a mechanical formula or mathematical calculation. *Windham v. American Brands, Inc., supra* at 68, *citing Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Ralston v. Volkswagenwerk, A. G.*, 61 F.R.D. 427, 433 (W.D.Mo.1973); *Shaw v. Mobil Oil Corp.*, 60 F.R.D. 566, 570 (D.N. H.1973). The Court is of the view that should plaintiffs establish Allied's liability to their respective subclasses, some type of individual adjudication of each plaintiff's damages may be necessary.

■ The fact that the adjudication of a class action or of a series of class actions would be burdensome for the Court and jury does not preclude (b)(3) class certification, however, unless the problems of manageability in a class action are found to be greater than, or the same as, those found in other available methods of adjudicating the proposed class' claims. It is not enough simply to conclude that a class action or class actions would be difficult to control or conduct, else the Court's decision concerning class certification would be an easy one indeed. Instead, Rule 23(b)(3), in conjunction with subsections (c)(4) and (d), provides the Court flexibility to tailor class treatment of predominantly common interests where no better method is apparent.

Allied suggests that more manageable alternatives are available, including individual actions, Rule 20 joinder, Rule 24 intervention with the *Adams* suit, Rule 42 consolidation for purposes of discovery, and lastly, the "test case" approach as developed under *Katz v. Carte Blanche Corp.*, 496 F.2d 747 (3d Cir. 1973), *cert. denied*, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974). The Court finds, however, that class actions brought by the six subclasses described above, in trials bifurcating the issues of liability and damages, would be superior in terms of judicial economy and fairness to any of the suggested alternatives.

■ Assuming that Allied's liability to plaintiffs can be adjudicated on a classwide basis for each subclass, the judicial system will be spared the time and expense involved with duplicative individual actions in which thousands of plaintiffs would have to litigate common questions of liability in separate actions. Understandably, if the Court were to deny class certification, many of the proposed class would more than likely neglect to file individual actions, a result which would obviously conserve judicial resources, but would do little to enhance justice. The superiority determination required by Rule 23(b)(3) involves a consideration of the fairness to the plaintiffs in the assertion of their claims, requiring the Court to presume that each has a valid claim that should be adjudicated in one manner or another. That plaintiffs have shown the predominance of common questions concerning Allied's liability to subclasses of claimants and the commonality of many questions of damage has satisfied the Court that the class actions proposed in this opinion would be superior methods of adjudication to thousands of individual lawsuits.

The Court sees no advantage to be gained in relegating the proposed class members to separate actions employing joinder of parties under Rule 20, Fed.R.Civ.P. Requiring each plaintiff to show the commonality of interest under Rule 20 would be duplicative of the burden borne by plaintiffs here in proving the predominance of common questions within each of the six subclasses. The logical result would be six separate trials in which the members of the subclasses set out above would be joined as parties plaintiff, not as class members, which would entail greater costs to the plaintiffs and prove unnecessarily burdensome to the Court as well.

The alternative of intervention with the *Adams* suit under Rule 24, Fed.R.Civ.P., is not a viable one, as such an approach would simply postpone addressing the problems of manageability cited here for a later proceeding in that case; additionally, the *Adams* case is nearing disposition. Rule 42(a), Fed.R.Civ.P., consolidation for purposes of discovery is no real alternative to mainte-

nance of class actions by the six subclasses as it provides only a partial savings of parties' time and expense. However, such consolidation may well be employed in conjunction with certification of the six subclasses so as to economize discovery efforts.

The test case approach suggested by Allied has an initial, but ultimately superficial, appeal to the Court. In a test case, as suggested in *Katz v. Carte Blanche Corp., supra,* an individual plaintiff litigates the substantive legal issues for the benefit of the entire class. If he secures the prior consent of the class members, a favorable judgment will have a binding effect on the defendant as against the class members through application of principles of collateral estoppel. *Galloway v. American Brands, Inc.,* 81 F.R.D. 580, 586 n.5 (E.D.N.C.1978). Ordinarily, the class members will not be bound to an adverse judgment beyond the *stare decisis* effect of that judgment. This method of adjudicating a large plaintiff class' claims has been endorsed by the Fourth Circuit as a viable alternative to a class action. *Windham v. American Brands, Inc., supra* at 69.

The Court, however, questions the availability of a test case in the instant action. Initially, the economies presented by this method are illusory to the extent that a court will have to undertake the same inquiry as this Court has made here to determine what legal issues may be litigated and what class or classes of plaintiffs may avail itself or themselves of a favorable judgment. *Cf. Jimenez v. Weinberg,* 523 F.2d 689, 701 (7th Cir. 1975), *cert. denied sub nom. Mathews v. Jimenez,* 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1204 (1976) (little difference between a class determination after ruling on the merits and test case followed by class action should individual prevail). The individual questions concerning causation and damages in the instant case could conceivably limit the class that benefits from the test case judgment to a very small one indeed, even if several test cases were litigated. *See Payton v. Abbott Labs.,* 83 F.R.D. 382, 392 (D.Mass.1979); *Wolfson v. Artisans Savings Bank,* 83 F.R.D. 547 (D.Del.1979). The instant case

does not present a plaintiff class or subclasses so large as to make a test case necessary. *See Hedges Enterprises, Inc. v. Continental Group, Inc.,* 81 F.R.D. 461, 477 (E.D.Pa.1979); *In re Folding Carton Antitrust Litigation,* 75 F.R.D. 727, 733 (N.D.Ill. 1977). Further, the Court has no indication of the proposed class members' willingness to pursue a test case approach and has serious doubts as to the ability of any single test plaintiff to absorb the expense and endure the mechanics of obtaining such consent from the class members. *Cf. Galloway v. American Brands, Inc., supra* at 586 (rejecting test case approach in the absence of any such indication). Class actions litigated by the subclasses designated above would be clearly superior, in the Court's view, to the test case method of adjudication.

The Court thus finds that plaintiffs have satisfied Rule 23(b)(3) requirements of predominance and superiority. The Court further finds that the horrors of unmanageability conjured by Allied in its opposition to class certification may vanish in the light of everyday judicial reality. The Court has at its disposal several devices with which to streamline the procedural morass presented by six subclasses, bifurcated trials, and thousands of claimants. In addition, the Court finds that several questions concerning both liability and damages may be dealt with on a classwide basis within each subclass.

Although Allied has emphasized the potential disparity among class or subclass members in the assertion of negligence and property-related causes of action, many claims will have more uniform application. Causes of action based on strict liability for Allied's allegedly dangerous and unreasonable discharge of the toxic effluents, on conspiracy to commit intentional tortious conduct, on violations of the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 *et seq.,* and the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.,* and conspiracy to commit the same, may not require any individualized showing of causation and impact, but may be easily handled on a classwide basis. Similarly, any equitable relief

sought by the class will and must be handled as an issue of common interest and applicability among the class members. Should the proximate cause and negligence issues not prove "subject to a clear cut determination," *Hernandez v. Motor Vessel Skyward,* 61 F.R.D. 558, 560 (S.D.Fla.1974), *aff'd,* 507 F.2d 1278 (5th Cir. 1975), then the class action may still proceed for those issues adaptable to class treatment. Rule 23(c)(4)(A), Fed.R.Civ.P.

If the Court's opinion is correct that Allied's liability to each subclass for pollution of Virginia waters may be litigated on a subclass-wide basis, and should plaintiffs prevail, only the resolution of class members' damage claims would remain. Of course, should Allied prevail on the question of liability, damages determinations are unnecessary. Even if Allied is adjudged liable for class damages, the Court is not as persuaded as was the district court in *Windham* that certification will swamp the Court with a deluge of damage mini-trials. *See Windham, supra* at 67. This Court shares the experience of Judge Frankel that:

> [t]here is reason to believe that civilized litigants and attorneys find ways to settle individual claims where the questions of general application go against defendants. But, of course, that hope or possibility may not be realized. In the rare cases where this is so, it is more fitting that the work of adjudication be done than that the multiplicity of claimants be blocked at the threshold by denial of the class-action procedure designed to give them an effective day in court.

*Shelter Realty Corp. v. Allied Maintenance Corp.,* 442 F.Supp. 1087, 1089 (S.D.N.Y. 1977), *dismissed without opinion,* 578 F.2d 1370 (2d Cir. 1978). The Court has the utmost confidence in the desire and willingness of the parties and attorneys involved here to settle their dispute amicably and efficiently, especially should a judgment of liability against Allied become a fact.

It is also conceivable that the number of claimants will be reduced in the event the Court employs Rule 23(d)(2) to direct that notice be sent to all the proposed subclass members requiring them to file their claims by a certain date. *Galloway, supra* at 586. Presumably, such a requirement would weed out those proposed subclass members who have no real damages to recover or no interest in recovering the damages suffered. Those plaintiffs who ultimately litigate their claims for damages may not necessarily be required to do so individually. Although the effects of pollution may vary depending upon a fisherman's or seafood dealer's location, the effects of the publicity surrounding Kepone pollution will be more uniform and widespread, and damages suffered therefrom, if any, may lend themselves to classwide treatment. Damages for statutory violations, if such damages are recoverable, may also be adjudicated on a classwide basis. Unlike plaintiffs' proof of damages in *Windham,* which entailed hundreds of tobacco markets, several marketing seasons, and transactions with and between several defendants, plaintiffs' claims here involve market loss damages allegedly caused by a single source.

The damages phase of the trial, if any be appropriate, may be referred to a Special Master appointed to conduct hearings on the class members' damages.[8] United States District Judge William H. Becker suggests that the jury could be excused temporarily while a Master makes his findings on all individual damages. The jury would then be recalled to hear the Master's report and any other evidence offered before reaching separate verdicts on the damages of each class member, under the doctrine of *Ex parte Peterson,* 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1920). Becker, *The Class Action Conflict—A 1976 Report,* 75 F.R.D. 167, 190 (1976).

There still remain some judicial housekeeping matters regarding the certification of the six subclasses of plaintiffs. As noted

**8.** It is unclear whether, under *Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931), the same jury that tries the issue of liability must try individual damages as well.

above, the Maryland class members are excluded from these class actions for reasons of manageability and the potential for antagonistic interests within the subclasses. It is the Court's opinion, and indeed the certification of these subclasses is, to some extent, conditioned upon the fact, that the Maryland parties, who may have relied on the pendency of the instant suit, will be able to avail themselves of the tolling of the relevant statutes of limitations by the institution of this action. The Court, again, adopts the reasoning of Judge Fullam in *Philadelphia Electric Co. v. Anaconda American Brass Co., supra* at 461, to the effect that where the Court determines that part or all of a proposed class action cannot be certified for "various considerations of judicial housekeeping," that determination should not relate back to the commencement of the action where there has been apparent reliance by the absent class members upon the pendency of the purported class action. The rationale for this approach is obvious; any other approach "would make it virtually mandatory for every class member to file a cautionary separate action within the limitations period." *Id.*; *see also Galloway, supra* at 587–88; *Minnesota v. United States Steel Corp.*, 44 F.R.D. 559, 572–73 (D.Minn.1968). *See generally* 7A Wright & Miller, *Federal Practice and Procedure*: Civil § 1795 at 221–22 (1972).

The Court's certification order, which in any event is tentative, will be further conditioned on (1) a showing of each subclass' satisfaction of Rule 23(a) prerequisites, particularly those of numerosity and adequacy of representation, and (2) a showing by the representative parties in each subclass of their ability to finance the cost of notice to absent class members required by Rule 23(c)(2). While the Court finds the proposed class action to have satisfied Rule 23(a) prerequisites, that determination may not necessarily compel a finding that the subclasses individually satisfy those requirements. Because the class has been significantly subdivided and the issues thereby refined, satisfaction of the prerequisites of numerosity and adequacy of representation,

as well as of commonality and typicality, must be reestablished for the benefit of each subclass to be certified. A showing by class representatives of their ability to finance notice to the class members is necessary to the end that the Court be assured of an effective notification to class members of the pendency of these actions and their opportunity to exclude themselves from a judgment therein.

An appropriate order shall issue.